NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

DON'S OLNEY FOODS, INC., d/b/a Olney IGA Foodliner, Respondent.

No. 88–1293.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 28, 1988.

Decided March 21, 1989.

---

Robert H. Brown, Kahn, Dees, Donovan & Kahn, Evansville, Ind., for respondent.

Julie Broido, N.L.R.B., Washington, D.C., for petitioner.

Before CUMMINGS and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

This case is before us on application of the National Labor Relations Board (the Board) for enforcement of its order, issued

against Don's Olney Foods, Inc., doing business as Olney IGA Foodliner (the Company). The Company operates a grocery store in Olney, Illinois.

On April 26, 1985, the Board brought a complaint against the Company alleging various unfair labor practices conducted during a union campaign at the store. After a hearing, the administrative law judge decided that, by firing Joe Wilson because of his union organizing activities, the Company had committed an unfair labor practice prohibited by § 8(a)(1) and (3) of the National Labor Relations Act. 29 U.S.C. § 151, et seq.[1] The ALJ also found that the Company had engaged in the following § 8(a)(1) unfair labor practices: creating the impression that the employees' union activities were under surveillance; coercively interrogating employees; claiming to know which employees had signed union cards and that the Company would learn who voted for the union; and by threatening employees with possible store closure, more onerous working conditions, and the loss of benefits, jobs, and pay if they chose to unionize. He also found that the Company's suspension of pay raises was prohibited by § 8(a)(1), (3) and (5), and that its refusal to bargain was an unfair labor practice under § 8(a)(1) and (5). He ordered the Company to cease and desist from its illegal practices, to offer Mr. Wilson reinstatement, and to grant employees the pay raises denied because of the union. The ALJ also ordered the Company to bargain with the union. A three-member panel of the Board, one member dissenting, affirmed the ALJ's rulings and conclusions (with modifications not relevant here) and adopted his recommended order. 286 N.L. R.B. No. 75 (Oct. 22, 1987).

The company raises four issues on appeal. First, if Mr. Wilson was a supervisor, firing him for union activity and coercively interrogating him would not be unfair labor practices. The Company argues that the evidence required the Board to find that he was a supervisor. Second, if employees Rick Rariden and Mike Zuber were supervisors, threats found to have been made against them were not unfair labor practices. The Company argues the evidence required a finding that they, too, were supervisors. Third, the Company argues that substantial evidence does not support the finding that the Company's failure to grant a wage increase was an unfair labor practice. Fourth, it claims the Board abused its discretion by imposing a bargaining order. The Company does not challenge the remaining findings of unfair labor practices involving other employees.

## I. SUPERVISOR STATUS

Section 2(11) defines a supervisor as any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). A person need only have authority to wield any *one* of the powers listed in § 2(11) to be considered a supervisor, *if* exercising that power involves true independence of judgment. *N.L.R.B. v. Chicago Metallic Corp.*, 794 F.2d 527, 530-31 (9th Cir.1986).

We keep in mind two things when the Board finds that an employee is not a supervisor. First, this court applies a deferential standard of review to the Board's determination, both because it is primarily a factual finding, and because, to the extent it requires statutory interpretation, it is a statute the Board is entrusted with enforcing. *N.L.R.B. v. Res-Care, Inc.*, 705 F.2d 1461, 1465-66 (7th Cir.1983).

Second, in enacting § 2(11), Congress intended to distinguish between employees vested with some limited supervisory power, such as "straw bosses, leadmen, set-up

---

1. As is customary, we cite to the uncodified National Labor Relations Act (the Act); the corresponding *Title 29 United States Code* citations can be determined by adding 150 to the uncodified section number.

men, and other minor supervisory employees," and "the supervisor vested with such genuine management prerogatives as the right to hire or fire, discipline, or make effective recommendations with respect to such action." *N.L.R.B. v. Bell Aerospace Co.*, 416 U.S. 267, 280–83, 94 S.Ct. 1757, 1764–66, 40 L.Ed.2d 134 (1974) *quoting* Sen.Rep. No. 105, 80th Cong., 1st Sess. 4 (1947); *Res–Care, Inc.*, 705 F.2d at 1466. The Board's case-by-case determinations of supervisory status under § 2(11) play an important role in preserving the distinction between employees with limited supervisory powers, and genuine supervisors. *See Res–Care, Inc.*, 705 F.2d 1461, 1465–66 (7th Cir.1983); *Westinghouse Electric Corp. v. N.L.R.B.*, 424 F.2d 1151, 1158 (7th Cir. 1970).

### A. Joe Wilson

Mr. Wilson's status is vigorously contested, and understandably so. If Mr. Wilson was a supervisor, his discharge was lawful. More significantly, Mr. Wilson solicited all 23 of the authorization cards obtained during the union's campaign; if he was a supervisor at the time, the counting of those cards toward a union majority could be questioned. See *C & W Super Markets, Inc. v. N.L.R.B.*, 581 F.2d 618, 620 (7th Cir.1978). The Company does not claim Mr. Wilson had the power to "hire, transfer ... lay off, recall, promote, discharge ... or reward" employees, or "effectively to recommend such action." He did have limited authority over co-employees during certain periods, though, and the Company insists this was authority to "suspend, ... assign, ... discipline ... or responsibly direct" employees involving enough independent judgment to make him a § 2(11) supervisor.

The store was managed by Manager Bill Zuber, Computer Manager Ed Millman, a day manager, and a night manager. Before September 17, 1984, Mr. Wilson had worked as night manager on Mondays, Tuesdays and Wednesdays, and as day manager on Thursdays and Fridays. Dave Bunting worked as day manager on Mondays, Tuesdays and Wednesdays, and as night manager on Thursdays and Fridays.

On September 17, the store hired a full-time night manager, Bob Malone, who was assigned to work nights Monday through Friday. During the next week, Mr. Bunting trained Mr. Malone for his night manager job, and Mr. Wilson acted as manager of the day shift. Mr. Bunting then returned to work as day manager, working Monday through Friday. Mr. Wilson continued working days, Monday through Friday, and alternated with Rick Rariden and Mike Zuber as night manager every third Saturday, until he was fired on October 19, 1984.

The Company argues that the authority Mr. Wilson had as an alternating night and day manager made him a § 2(11) supervisor, and that his authority did not diminish after his change of duties, even though he could exercise it only every third Saturday evening, and during a few daytime hours when the day manager was at lunch, or preoccupied with unloading incoming trucks.

The ALJ decided Mr. Wilson was not a supervisor. His decision was a fair summary of the evidence, and included finding that on September 21, Manager Zuber told Mr. Wilson he was no longer "in charge" except every third Saturday, and that his position was below that of the day and night managers. The ALJ also found that this change amounted to a demotion; that Mr. Wilson was not perceived to be a supervisor by himself, fellow employees, or Manager Zuber; that his allegedly managerial duties every third Saturday night were routine and limited so as not to require independent judgment; and that he was an ordinary employee whose authority extended at most to making assignments of employees in the absence of the managers, requiring independent judgment, if at all, only sporadically and infrequently.

Every third Saturday night, Mr. Wilson was the highest available employee from around 4:00 PM, when Manager Zuber left, to midnight, when the store closed. When his shift began, the store would have about twelve employees, dwindling down to three or four as the evening wore on. Mr. Wilson told some of the employees when it

was time for their breaks, and he could remind them when their breaks were over. He assigned some of the employees their duties—working as carry-out or stocking shelves, mopping the floor, and cleaning out the dairy, meat and produce cases. He responded to "manager calls" by the checkers to approve checks, refunds and overrings, which sometimes involved unlocking the registers. He closed out the registers when the checkers' shifts ended.

Before the job change, Mr. Wilson had additional authority as night manager. He initialed the time cards of employees clocking in late who had excuses or if the time clock wasn't working; he could send workers home if business was slow or ask them to stay late if necessary; he could call in unscheduled workers if they were needed. If disciplinary problems arose, he could send the offender home for the evening, but Manager Zuber handled the disciplining the next morning. He once reprimanded an employee for "smarting off" to a customer. There was no evidence that he exercised any of these powers on the two Saturday nights he worked before being fired.

Mr. Wilson testified that during the week (after the job change) he worked primarily as a "carry-out," bagging groceries and taking them out to customers' cars, and stocking shelves. He was also expected to "help out any way that [he] could," which he did by answering manager calls, and checking in and paying vendors who delivered goods to the store. Mr. Bunting, the day manager, took hour-long lunch breaks, and for three hours on Monday and Thursday mornings he supervised the unloading of grocery trucks. During that time, Mr. Wilson effectively was the senior employee on the floor. Although the Company claims that he then was responsible for assigning work, Mr. Wilson testified (and a substantial number of other employees—both checkers and carry-outs—agreed) that he did not assign employees when working days.

Mr. Wilson testified that when Manager Zuber put him on days, Mr. Zuber told him he had been "loafing" and "acting like he didn't need a job" and that he would no longer be "in charge." Mr. Zuber claimed that he told Mr. Wilson he still expected him to be a manager, but the ALJ did not credit this testimony. The ALJ's decision is supported by Rick Rariden's testimony that he overheard Mr. Zuber telling Mr. Bunting that Mr. Bunting "was the manager and he wasn't supposed to take any static from Joe because Joe wasn't the manager," and by employee Bob Och's testimony that after following Mr. Wilson's suggestion to bale some boxes during Mr. Bunting's lunch hour, Mr. Zuber scolded him because he did not first "ask the manager what to do and he's not here."

We conclude there is substantial evidence in the record to support the ALJ's finding that Mr. Wilson was not a § 2(11) supervisor. Occasionally working as the highest ranking employee, even if regularly scheduled to do so, is not determinative. In *C & W Super Markets Inc.*, we enforced an order finding a grocery store employee who rotated with another employee as "night manager" protected under the Act. 581 F.2d at 621–22. Similarly, in *Town & Country Supermarkets*, 244 NLRB 303, 308 (1979), enforced as *N.L.R.B. v. Wilhow Corp.*, 666 F.2d 1294 (10th Cir.1981) the Board found that a grocery worker who was in charge of the store six hours every other Sunday was not a supervisor.

Occasional duty as high-ranking employee is even less likely a badge of true supervisory authority when, as here, the amount of independent judgment required during the supervisory periods is limited by practical working conditions. *Quik–Pik Food Stores, Inc.*, 252 NLRB 506, 509 (1980). Mr. Wilson testified that the day manager left a list of chores to be done on the Saturday night shift. Breaks were customarily taken midway through an employee's shift. The checkers and carry-outs to whom Mr. Wilson supposedly assigned work were familiar with their jobs and did not require significant supervision. On Saturday nights, Mr. Wilson assigned employees to specific tasks such as cleaning the meat and produce cases, but as the

Board noted, he worked at these jobs side by side with the two carry-outs.

There was substantial testimony that an informal seniority system minimized Mr. Wilson's need to exercise independent judgment by helping the employees allocate job assignments among themselves: the least senior checker did the most checking, and used a buzzer to call for additional checkers and carry-outs when needed; the least senior carry-out did the most sacking and carrying out, responding first to calls for assistance by checkers.

The record does not show that Mr. Wilson was held accountable for the performance of those allegedly working under him, which can be of crucial importance in deciding whether an employee is a supervisor. *N.L.R.B. v. Adam & Eve Cosmetics, Inc.,* 567 F.2d 723, 728 (7th Cir.1977). On Mondays, Manager Zuber would "go around throughout the store and make sure that the Saturday night crew done everything they were supposed to do," but he never claimed that Mr. Wilson answered for the work of the Saturday night crew, or for the day workers he supposedly directed in Mr. Bunting's absence.

A number of Mr. Wilson's other responsibilities—answering manager calls, closing up the store on Saturday night, checking in and paying vendors—did not involve the supervision or direction of employees' work, and the ALJ could properly choose not to give them controlling weight.

The ALJ also considered various "secondary indicia" of supervisory status, factors which, while they do not directly indicate the responsibility to oversee others, do affect actual and perceived alignments of interests between management and workers. See *e.g., Adam & Eve Cosmetics, Inc.,* 567 F.2d at 728–29.

Mr. Wilson received a $0.75 per hour pay raise when he was promoted to night manager. The Company relies on the fact that his pay was not reduced after Mr. Malone

was hired, and he continued to make significantly more (up to twice as much) than the employees he supposedly supervised. The ALJ found, however, that seniority was "of prime consideration" in determining an employee's pay, and that "an employee's rate of pay was not an indication" of supervisor status. Mike Zuber, a worker who rotated as Saturday night manager with Mr. Wilson, testified that he was told they "don't get paid extra" for their Saturday night responsibilities. There was also substantial, though disputed, evidence that Mr. Wilson's fellow employees no longer considered him to be a supervisor.

Other secondary indicia are either neutral or support the ALJ's decision. Mr. Wilson did not attend manager meetings. As the Company points out, after being assigned to the day shift, he was not required to start punching the time clock, nor did he lose insurance or pension benefits. But the record indicates that these benefits were more closely tied to whether an employee was full- or part-time, rather than a supervisor. Mr. Wilson had access to, but did not have his own, store keys (Saturday nights only) and cash register keys (to answer checker's calls). Finally, the supervisor-to-employee ratio provides little guidance; if Mr. Wilson was a supervisor, at times the store had as many as five persons supervising six employees; on the other hand, if Mr. Wilson wasn't a supervisor, Saturday night found the store with no supervisors at all.

Some feel the Board has not hoed an invariably straight row on the supervisor issue. See *Res–Care, Inc.,* 705 F.2d at 1466; *N.L.R.B. v. St. Mary's Home, Inc.,* 690 F.2d 1062, 1067 (4th Cir.1982); Note, The NLRB and Supervisory Status: An Explanation of Inconsistent Results, 94 *Harv.L.Rev.* 1713 (1981).[2] However, the Company has not persuaded us that we do not owe deference to the Board's decision in this case. "It is enough that the Board's result in this case is not in conflict with

---

**2.** The Board's most recent applications of § 2(11) to grocery store employees similar to Mr. Wilson are *Thriftway Supermarket,* 276 NLRB 1450, 1451 (1985); *Town & Country Supermarkets,* 244 NLRB 303, 308 (1979) enforced,

666 F.2d 1294 (10th Cir.1981); *Quick–Pik Food Stores, Inc.,* 252 NLRB at 509; *Sav–Mor Centers, Inc.,* 234 NLRB 775, 778–79 (1978); *Dexter IGA Foodliner,* 209 NLRB 369, 371–72 (1974).

prior case law ... does no violence to the language of the statute, and, most important, is consistent with the purposes that animate that language as nearly as we can infer them from the place of section 2(11) in the overall scheme of the Act." *Res-Care, Inc.*, 705 F.2d at 1468.

### B. Mike Zuber and Rick Rariden

Mike Zuber and Rick Rariden rotated with Mr. Wilson working as Saturday night manager, wielding on those nights the same authority as Mr. Wilson. Mike Zuber worked the rest of the week as a carry-out on the night shift, in charge only when the night manager, Dave Bunting, took his hour break. Rick Rariden worked the day shift as a carry-out junior to Mr. Wilson, and was rarely in charge in the day manager's absence. Unlike Mr. Wilson, neither had previously worked as a full-time manager, and so the Company did not claim they had any residual authority.

It follows from our discussion concerning Mr. Wilson that the ALJ's finding that these men were not supervisors is supported by substantial evidence.

## II. SUSPENSION OF PAY RAISES

The Company gave its employees raises every six months going back at least to 1980. Before the union campaign, Manager Zuber had decided to continue this practice in January, 1985, but hadn't yet decided how much each employee was to receive. He thought the raises would range from zero to fifty cents an hour, depending on employee performance. He began calling employees into his office individually to discuss their upcoming raises. After talking with five or six, he received notice from the union seeking to bargain, and decided he could no longer talk to the employees individually and make "a wage offer or anything in that nature." He stopped interviewing employees, and gave no raises.

■ Withholding a regularly scheduled benefit during a union campaign, just like granting an unexpected one, can violate Section 8(a)(1) and (3) of the Act. *N.L.R.B. v. Industrial Erectors, Inc.*, 712 F.2d 1131, 1135 (7th Cir.1983). In order not to unfairly influence a union election, the employer must maintain the pre-union *status quo* respecting employee benefits, viewed dynamically; that is, expectations of upcoming benefits created by the employer either by promises or through a regular pattern of granting benefits cannot be disappointed without proof of a union-neutral justification. *Southern Maryland Hosp. Center v. N.L.R.B.*, 801 F.2d 666, 668–69 (4th Cir. 1986); Robert A. Gorman, Basic Text on Labor Law at 168 (1976).

■ We think the record discloses an established practice of employee evaluations and pay raises every six months which "would be clearly apparent to an objectively reasonable employer." *Gossen Co. v. N.L.R.B.*, 719 F.2d 1354, 1357 (7th Cir.1983) (adopting test from *Plasticrafts, Inc. v. N.L.R.B.*, 586 F.2d 185, 188 (10th Cir.1978)). A raise need not be scheduled for an exact day before it is "regularly scheduled"; Manager Zuber himself admitted that he "was to talk with each individual ... and at the end of each six months we would either give raises or would not," and the record supports a conclusion that pay raises were considered every six months for most employees since 1980. Almost all employees got *some* pay raise every six months, and all employees could expect to have their work evaluated and get a raise if their work merited it. The fact that the amounts of the raises had not been determined did not relieve the Company of its duty objectively to carry out its customary practice. *Gossen Co.*, 719 F.2d at 1357; *Industrial Erectors, Inc.*, 712 F.2d at 1135.[3]

## III. BARGAINING ORDER

■ The Board, as did the ALJ, listed the types of violations found, and said "[t]hese violations are sufficiently numerous, severe, and pervasive to warrant a

---

**3.** Because the Board found that the Company should have recognized the Union, it also found the Company's failure to notify and bargain with the Union about its unilateral decision to delay the expected evaluations and raises violated § 8(a)(5). The Company does not challenge this finding.

bargaining order. In view of the size of the unit involved [approximately 30 employees], the widespread knowledge of the violations, and the severity of the Respondent's conduct we find it unlikely that the lingering effects of the Respondent's conduct will be dissipated by a cease-and-desist order."

The Company briefly argues that the Board abused its discretion, noting that if we were to deny enforcement with respect to Mr. Wilson or the withheld pay increases, the primary support for this remedy would vanish.

We have sustained the finding as to Mr. Wilson and the withheld pay increases, however, and note the unchallenged findings of other Company unfair labor practices which could have also affected the employees' free choice: the Company's management told its employees unionization could mean job loss, stricter discipline, lower pay and even store closure; the head cashier, an agent of the company and wife of Computer Manager Millman, questioned employees in her home about their union sympathies; Manager Zuber threatened Mr. Rariden with discharge by reminding him Mr. Wilson had been fired for being disloyal; the Company created the impression that employees' union activities were under surveillance; and the company claimed it would know who signed union cards and who voted for the union in the election.

Finally, the Company in a concluding phrase suggests the argument that the Board failed adequately to articulate its reasons for ordering the Company to bargain with the union. We cannot reach the merits, if any, of this complaint because the Company neither gave the Board the first opportunity to answer it, nor shows any extraordinary circumstances excusing its failure to do so, as required by Section 10(e) of the Act. 29 U.S.C. § 160(e); *Woelke & Romero Framing, Inc. v. N.L.R.B.*, 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2083, 72 L.Ed.2d 398 (1982).

The Board's order will be ENFORCED.