**DREYER'S GRAND ICE CREAM, INC.,
d/b/a Edy's Grand Ice Cream,
Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent/Cross–
Petitioner.**

Nos. 97–2353, 97–2679.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1997.

Decided March 27, 1998.

Gregory D. Wolflick (argued), Wolflick & Simpson, Glendale, CA, for Dreyer's Grand Ice Cream, Inc.

Charles P. Donnelly, Jr., National Labor Relations Board, Contempt Litigation Board, Aileen A. Armstrong, Vincent Falvo (argued), National Labor Relations Board, Appellate Court, Enforcement Litigation, Washington, DC, Walter Steele, National Labor Relations Board, Region 25, Indianapolis, IN, for National Labor Relations Board.

Before CUDAHY, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

In the wake of a failed unionization drive at its Fort Wayne, Indiana plant, Edy's Grand Ice Cream ("Edy's") took steps to avoid future organizational efforts. Accordingly, Edy's fired five employees who had been active with the union and committed lesser acts of retaliation against several others. These lesser acts included instructing employees who had supported the union to quit, interrogating them about their union activities, and suspending their memberships on the plant's disciplinary committee. The National Labor Relations Board ("the Board") ordered Edy's to cease and desist from these activities and to reinstate the five terminated employees. In this petition for review of the Board's decision, Edy's contests only the Board's reinstatement order. For the reasons that follow, we affirm the Board's decision.

I.

The organization of Edy's Fort Wayne facility is unusual. The workforce is divided into six vertically-integrated business units that rotate on a three-shift, 24–hour basis. Each business unit is divided into three teams; each team has eight to twelve employees. Through regular team meetings, team members have input into decisions regarding staffing, disciplinary matters, and strategies for reaching output goals. In addition to their work with their teams, employees may serve on various committees at the plant, including the Organizational Review Board ("the ORB"), which reviews disciplinary decisions made by the various teams. Over the long run, Edy's hopes that this organizational structure will allow the employees to run the plant entirely on their own, without oversight by managers. In the meantime, however, Edy's does employ traditional managers, who comprise a committee called the "M–Team."

The United Food and Commercial Workers, Local 700 started a union organization effort at the plant in September 1993. Although the union ultimately lost the representation election on March 17, 1994, the organization drive had lasting effects on management's outlook. Four days after the representation election, Plant Manager Kirk Raymond distributed a letter to employees thanking them for rejecting the union. Raymond's letter also stated, "I am, however, very disturbed by comments from some team members who believe that this experience was in some way good for us. So that there are no misconceptions—*this experience was extremely bad for us and one we should not repeat!*" Raymond's testimony in the administrative proceedings before the Board further revealed his sense of personal betrayal. According to the Administrative Law Judge:

Raymond's testimony before me reflected greater hostility than he had expressed ... in his letter to his employees. He admitted that he did not want his employees to engage in union activity again. Further, he admitted that in his view a supervisor or anybody who engaged in union activity was engaging in the equivalent of stealing from the company or punching

somebody out. Continuing, Raymond admitted that he viewed stealing from the company or punching someone out "as offenses ... for which one could be discharged without warning."

In the months following the union's defeat in the representation election, Edy's lashed out at a number of employees who had been active in the unionization drive, suspending several such employees from serving on the ORB and terminating the employment of five others. Local 700 filed unfair labor practice charges, and on September 12, 1996, the Administrative Law Judge issued his decision. The ALJ found that Edy's had violated § 8(a)(1) of the National Labor Relations Act ("NLRA" or "the Act") by instructing employees who had supported the union to quit, by interrogating employees about their union activities, and by suspending employees from the ORB in retaliation for their union support. The ALJ also determined that Edy's had violated § 8(a)(1) and (3) by suspending employees, removing them from the ORB, and discharging them because of their union activities. The Board adopted the ALJ's findings on May 9, 1997 and ordered Edy's to cease and desist its unlawful activities and to reinstate the five employees whom it had unlawfully discharged. Edy's petitions this Court for review of the portion of the Board's order requiring reinstatement of the five terminated employees: Robert Byanski, Steven Leatherman, Joe Troendly, Lois Jones, and Amy Wickensheimer.

## II.

### A. Robert Byanski and Steven Leatherman

■ Edy's admits that it fired Robert Byanski and Steven Leatherman because of their union activities. Edy's argues that this action was not unlawful, however, because Byanski and Leatherman were supervisory employees and were therefore outside of the NLRA's protection.

■ Section 2(11) of the Act defines a supervisor as

any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The distinction between supervisors and employees is crucial in maintaining "the balance of power between companies and unions". *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1465 (7th Cir.1983) (discussing the policy justifications underlying the statutory prohibition against unionization of supervisors). The Board is permitted "a large measure of informed discretion" in determining whether employees are supervisors under the statutory definition. *Dynamic Machine Co. v. NLRB*, 552 F.2d 1195, 1201 (7th Cir.), cert. denied, 434 U.S. 827, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977). Determination of supervisor status "is primarily a factual finding," and "to the extent it requires statutory interpretation, it is a statute the Board is entrusted with enforcing." *NLRB v. Don's Olney Foods*, 870 F.2d 1279, 1281 (7th Cir.1989). We will not overturn the Board's determination of supervisor status if it is supported by substantial evidence in the record. *Id.* at 1283.

Edy's contends that Leatherman and Byanski were supervisors by virtue of their status as former "Super–Coordinators" at the plant. Edy's created two Super–Coordinator positions in 1990 to oversee groups of teams and to troubleshoot and fill in when production problems occurred. Byanski and Leatherman held these positions, which paid an additional $1.50 per hour, until Edy's eliminated the Super–Coordinator positions in 1991. Edy's created a new position, that of facilitator, to replace the Super–Coordinators, but Byanski and Leatherman were not selected to be facilitators. Thus, Byanski and Leatherman returned to their regular production jobs, but they continued to receive the additional $1.50 per hour.

Edy's argues that Byanski and Leatherman were expected to perform Super–Coordinator duties on an intermittent, as-needed basis even after the positions were formally

eliminated. In support of this proposition, Edy's points to its policy on employee training and advancement. According to this policy, an employee who rises through the ranks by mastering new "modules" or skill-sets must fill in when temporary absences occur in positions that the employee is trained to perform. Thus, in Edy's view, Super–Coordinating is like any other set of skills; an employee who has acquired these skills is expected to perform them as needed even after the employee has moved on to a different position.

Edy's contends that the Super–Coordinator positions were supervisory because both Byanski and Leatherman (when they held those positions) interviewed and made recommendations in hiring new employees, had authority to discipline employees, made staffing decisions regarding temporary employees, gave work direction to team members, and approved pay increases for team members. Even if this were sufficient to establish that Byanski and Leatherman, as Super-Coordinators, were supervisors and not "straw bosses, leadmen, set-up men, [or] other minor supervisory employees" who are considered employees, and not supervisors, under the NLRA, see *Don's Olney Foods*, 870 F.2d at 1281–82, Edy's presents no evidence that either Byanski or Leatherman actually performed Super–Coordinator duties after these positions were eliminated, even on an intermittent basis. Edy's asserts that the two men's continuing authority to act as Super–Coordinators is enough, even though they did not actually exercise this authority after 1991. *See NLRB v. Metropolitan Life Ins. Co.*, 405 F.2d 1169, 1173 (2d Cir.1968) ("[J]ust the possession of any one of the listed powers [in Section 2(11) of the NLRA] is sufficient to cause the possessor to be classified as a supervisor even if the power is not customarily exercised."); *West Penn Power Co. v. NLRB*, 337 F.2d 993, 996 (3d Cir.1964) ("We quite agree ... that it is the fact of possession of the [Section 2(11) ] power regardless of its nonexercise that is determinative."). However, Edy's fails to establish that Byanski and Leatherman possessed even unexercised authority. According to the ALJ,

[T]here was no showing that after they returned to production work they continued to sign personnel actions or issue directives to employees, as supervisors. *Nor did the record show that after they returned to production work, any member of Edy's management ever told Bob [Byanksi] or Steve [Leatherman] that Edy expected them to perform any of the duties and bear any of the responsibilities of a super-coordinator.*

(Emphasis added)

It is difficult to accept Edy's argument that Byanski and Leatherman retained their supervisory status, even after the new "facilitators" took over their coordinating functions, when Edy's never told them that they were expected to serve as supervisors and, in the course of two years, they did not once act in a supervisory role. Furthermore, "[s]tepping back from the details" of Leatherman and Byanksi's responsibilities and "examining the facts in light of the policies behind section 2(11)," we do not think that the Board's categorization of ex-Super-Coordinators as employees means that "the employer will be helplessly overmatched, lose control of his work force, [or] have no loyal cadre of supervisors." *NLRB v. Res–Care, Inc.*, 705 F.2d 1461, 1468 (7th Cir.1983). Given the deferential standard of review afforded the Board's determination, we decline to overturn the Board's finding that Byanski and Leatherman were employees covered under the NLRA.

### B. Joe Troendly

■ Edy's makes a similar claim that Joe Troendly, another employee admittedly terminated for his organizing activities, was a supervisor by virtue of his status as the former chief maintenance engineer. As chief, Troendly worked with outside vendors, advised on staffing issues, and drafted memoranda regarding the use of equipment and tools. In return, he received an extra $1.00 per hour. Troendly resigned his position as chief in 1990 and returned to his position as maintenance engineer. He offered to return the $1.00 per hour, but Edy's told him to keep it because he could be called upon to train and assist less experienced engineers.

Edy's claims that Troendly continued to exercise the supervisory functions he previously performed as chief maintenance engineer; the only difference after Troendly "resigned" was that another employee picked up much of his paperwork. Edy's points to only one actual instance, however, where Troendly allegedly performed a supervisory function after his resignation as chief. In March 1993, Troendly developed a proposal on behalf of the engineering group, which he later presented to the M–Team, making recommendations for reorganizing the engineering department. Although Troendly took the lead in developing the proposal, the proposal itself was signed collectively by "The Engineers" and suggested that management direct any questions towards "Dave, Pete, Joe, or any of the Engineering group".

The Board found that Troendly's role in crafting this report did not suffice to establish his supervisor status, for there was no evidence that Troendly "used independent judgement to assign or direct anyone to do anything." Far from acting as a supervisor directing workers in the performance of their duties, Troendly instead was serving as the representative of his fellow workers—the engineering group—in making suggestions to their supervisors about how to organize the department. Edy's offers no evidence contradicting the Board's understanding of Troendly's role in developing the report. Since this understanding is supported by substantial evidence, and given the dearth of other evidence suggesting that Troendly retained a supervisory role, we affirm the Board's order to reinstate Troendly.

## C. Lois Jones

■ Lois Jones worked for Edy's as a production employee from 1984 until her termination on April 23, 1994. Jones had been an exemplary employee with an unblemished employment record, and she had recently been elected by her team members to Edy's All–Star Team because of her strong job performance. Jones was also active in the unionization drive, however, and was listed by the union in December 1993 as a member of the union's organizing committee.

Jones took a disability leave in February 1994 to have surgery on her foot. Jones's doctor informed the company that Jones would have to miss work for "at least 6–8 weeks following surgery," which took place on February 22. On April 19, exactly eight weeks after her leave began, Edy's recorded Jones as absent without permission. Edy's did not inform Jones of this fact or attempt to contact her. When Jones again failed to report to the plant on the next two workdays, Edy's sent a letter informing her that, because she had been absent for three consecutive days without permission, Edy's was "removing [her] from the active payroll and treating [her] conduct as a voluntary resignation effective Saturday, April 23, 1994." When Jones received this letter, she drove to the plant and tried to present management with a new note from her doctor extending her rehabilitation period through May 15. Management refused to look at the new note and directed Jones to clean out her locker.

Edy's claims that its actions toward Jones were dictated by its policy on absenteeism, which calls for the termination of employees who miss three consecutive days without a valid excuse. The Board, however, concluded that this reason was pretextual and that the real motivation for firing Jones was her pro-union activity. The Board noted that no specific date had ever been set for Jones's return; her doctor's note indicated that she would need "at least" six to eight weeks to recover. Yet Edy's began counting absences as unexcused—without ever notifying Jones—exactly eight weeks from the start of her leave. Furthermore, the Board found, the timing of Edy's action against Jones was highly suspicious. Jones's termination occurred within a month of Plant Manager Raymond's anti-union letter to the plant employees, the suspension of several pro-union employees from the ORB, and the terminations of Byanski, Leatherman, and Troendly.

Edy's argues that it has applied its three-day absentee policy consistently and that Jones had the responsibility to keep the company apprised of any change in her expected return date. Edy's admits, however, that it has never before applied its three-day absen-

tee policy to workers coming off of a disability leave. In addition, Jones's alleged responsibility to keep the company informed about changes in her return date assumes that there was a set date in the first place. Edy's ambitious interpretation of the doctor's note to establish a date certain, coupled with its failure to contact Jones (who by all accounts was an experienced, competent employee), supports the Board's conclusion that the real motivation for terminating Jones was retaliation for her union activity. The Board's assessment is supported by substantial evidence, and we uphold its order of reinstatement.

### D. Amy Wickensheimer

Amy Wickensheimer began working at Edy's Fort Wayne facility in 1989 as a palletizer. Like Lois Jones, Wickensheimer was a member of the union's organizing committee during the unionization drive in 1993. In March 1994, Edy's briefly suspended Wickensheimer from serving on the ORB, on the grounds that her support for the union revealed that she could not be a team player. The Board found that this suspension violated § 8(a)(3) and (1) of the NLRA; Edy's does not contest this determination.

■ Edy's does contest, however, the Board's conclusion that its subsequent termination of Wickensheimer violated the Act. In October 1994, Wickensheimer attempted to take a week off from work without permission. She missed two days of work, as well as some team meetings, and then lied to her team by telling them that she had arranged for coverage for an entire week when in fact she was covered only for a single day. Her team discovered her ruse and recommended to the ORB that she be terminated. The ORB declined to act on the team's recommendation unless the team could provide more documentation of Wickensheimer's offense. The team then apparently reconsidered its recommendation and decided instead to give Wickensheimer a "contract," which would give Wickensheimer one more chance to improve her performance or else be termi-

nated. Two team members drafted the contract and showed it to Dave Steinman and Fred Andriano, both M–Team members.

Eonn Pence, one of Wickensheimer's team members who also served on the ORB, testified regarding Steinman and Andriano's* reaction to the draft contract. According to Pence, the two men told him that the team could not change its recommendation this late in the day. The recommendation of termination was still pending before the ORB; the next step in the process was to return to the ORB with the information substantiating Wickensheimer's offenses. According to Pence's testimony, Steinman and Andriano gave this advice in the context of "offer[ing] information ... as to how ORB is supposed to work." Thus, instead of forwarding the contract to the ORB, as the team had planned, Pence presented the ORB with two alternative sanctions-the contract or outright termination. The ORB chose termination, and the M–Team agreed. The M–Team adopted the ORB's recommendation because, in the words of Production Manager Scott West, Wickensheimer was not "a team player."

Pence's affidavit, submitted prior to the administrative hearing before the ALJ, tells a slightly different story. According to the affidavit, Steinman and John Williams took an active role in the meeting at which the team decided to recommend a contract in lieu of termination. The two managers discouraged the team from changing its recommendation, telling the team members that "we don't know why you are keeping her around. She has caused dissention [sic] and it is time to cut your losses and terminate her." In another section of the affidavit, Pence stated that, after being shown the draft contract, Steinman said, " 'We talked about this in M–Team. There is enough information here indicating you guys have lost trust in her. We want you to take the documentation back to the ORB along with your original recommendation and see what happens.' " Pence's affidavit then states, "I felt I should do as he said because that is what M–Team decides.

---

* In another part of his testimony, Pence states that he showed the draft contract to Steinman and

John Williams, another manager.

The team doesn't have final authority over these things. The M–Team couldn't support a contract. They could support termination. The M–Team is the final authority, not the team."

The ALJ found that Steinman and Williams had "insisted that Eonn Pence and [his co-author on the contract] abandon the contract and urge the ORB to recommend [Wickensheimer's] termination. Pence's testimony makes clear that he capitulated because supervisors were pressuring him to urge the ORB to give Edy the chance to terminate Amy." Edy's argues that the ALJ's finding, adopted by the Board, is not supported by substantial evidence. In particular, the company contends that Pence was an unreliable witness because his testimony before the ALJ departed from the statements in his previous affidavit. The ALJ relied heavily on Pence's testimony regarding Steinman, Andriano, and Williams' role in recommending Wickensheimer's termination. Since Pence's testimony is unreliable, Edy's argues, the Board's conclusion that these managers pushed the team towards recommending termination lacks any solid foundation.

Although Pence's testimony was not a model of clarity, we do not agree that it was so contradictory as to render the ALJ's factual findings unreliable. Pence's affidavit does have a somewhat different cast than his testimony before the ALJ. However, several times during the hearing, the General Counsel asked Pence—who was still employed by Edy's at the time of his testimony—to refer to his affidavit to refresh his recollection of events. Each time, Pence affirmed the account provided in his affidavit. Furthermore, the difference between the two accounts is only one of emphasis, not of substance. Pence was consistent in maintaining that the managers directed the team to recommend Wickensheimer's termination when the team itself had reconsidered and decided on a contract instead. In Pence's affidavit, the direction given by the managers is overt; in his testimony, this direction is couched in terms of providing information about the ORB's procedural rules, which (according to the managers) required the ORB

to act on the termination recommendation currently pending before it. Either way, substantial evidence supports the Board's finding that Steinman, Andriano, and Williams played an important role in ensuring that the team's recommendation included termination as an option.

Moreover, the ALJ found it significant that the M–Team, in acting on the ORB's recommendation, emphasized that Wickensheimer was terminated because she was "not a team player." This phrase echoed management's stated reason for unlawfully suspending Wickensheimer from serving on the ORB several months before. The use of the same phraseology and reasoning in both the suspension and termination decisions suggests that each decision stemmed from similarly unlawful motives.

Finally, the record reflects that it was unusual for Edy's to terminate an employee who, like Wickensheimer, had only two unexcused absences. According to Edy's policy, an employee with two absences would receive only a written warning. According to Pence, who himself was a member of the ORB, typically an employee could miss five days without any excuse and still receive only a verbal or written warning. Edy's, however, decided to impose the much more severe sanction of termination in Wickensheimer's case. Edy's rapid deployment of this ultimate sanction, together with the other evidence of management's involvement in shepherding Wickensheimer's termination through the team and the ORB, supports the Board's conclusion that Edy's terminated Wickensheimer because of her union activities. Given the deferential standard of review for the Board's determination, especially with regard to the credibility of witnesses, *see NLRB v. Gerig's Dump Trucking*, 137 F.3d 936 at 940–41 (7th Cir. 1998), we cannot say that the Board's order of reinstatement is unsupported by substantial evidence in the record.

### III.

For the foregoing reasons, we enforce the Board's decision and order respecting the reinstatement of Robert Byanski, Steven

Leatherman, Joe Troendly, Lois Jones, and Amy Wickensheimer.

