In the
United States Court of Appeals
For the Seventh Circuit

No. 99-4187

National Labor Relations Board,

Petitioner,

v.

Aluminum Casting & Engineering Co., Inc.,

Respondent.

On Application for Enforcement of an
Order of the National Labor Relations Board.
Nos. 30-CA-12855, et al.

Argued September 6, 2000--Decided October 13, 2000

   Before Manion, Kanne, and Diane P. Wood, Circuit
Judges.

   Diane P. Wood, Circuit Judge.  This case has lain
in labor relations limbo for nearly six years,
between a union victory in an election that was
ultimately set aside and the holding of a new
election. In the meantime, the company has (quite
happily, we may assume) been operating union-
free, and the National Labor Relations Board (the
Board) has been pursuing a series of unfair labor
practice charges based on conduct both before and
after the contested election. Eventually the
Board found that the company, Aluminum Casting &
Engineering Co., or ACE/CO, had committed a
number of violations of the National Labor
Relations Act, sec.sec. 8(a)(1) and (3), 29
U.S.C. sec.sec. 158(a)(1) and (3), and it issued
an order requiring ACE/CO to cease and desist and
to take certain affirmative steps to cure those
violations. Aluminum Casting & Engineering Co.,
328 NLRB No. 2, 1999 WL 678727 (April 9, 1999).
We enforce most of that order, but as we explain
below, we decline to enforce with respect to one
of the charged violations, and we enforce the
remedy only as clarified by the Board's counsel
at oral argument.

I

   ACE/CO is a Milwaukee company in the business
of manufacturing automobile parts. From 1971 to

1988, its employees were represented by the Moulders Union. The experience was an unhappy one, at least for ACE/CO. Strikes and violence were the order of the day, and the relationship ended in 1988 when the parties were unable to agree on a new collective bargaining agreement. No new union activity seems to have begun until July 1994, when the United Electrical, Radio & Machine Workers of America (the Union) began an organizing drive among ACE/CO's 400-some production and maintenance workers.

To avoid undue repetition, we discuss the particular events during the organizing campaign that followed in connection with the particular charges the Board brought. It is enough to say here that the election took place on January 5 and 6, 1995. Of the 396 ballots cast, 193 were in favor of the Union and 183 were against; challenged and void ballots would not have changed the result. On the other hand, it turned out that many of the ballots were flawed because of erroneous translations into the several languages spoken at the workplace, including Hmong and Vietnamese. Following a June 1995 hearing on these objections filed by ACE/CO, the Board set aside the January 1995 election and directed that a new one take place. To this day, it has not set a new date, because (as the administrative law judge in this case put it), "further processing of the representation case is blocked by the unfair labor practice charges in this case."

The charges to which the administrative law judge (ALJ) referred were filed by the Regional Director of the Board. There was a hearing on these charges in February 1998, and ALJ William G. Kocol issued a decision in May 1998, to which both ACE/CO and the Board's General Counsel filed exceptions. The Board ultimately found that ACE/CO had violated the National Labor Relations Act (the Act) in a number of respects: (1) by failing to follow its established practice of giving an annual across-the-board wage increase in early 1995 and by engaging in conduct that indicated to the employees that the failure to receive this increase was the Union's fault; (2) by prohibiting solicitation "except when all concerned are relieved from duty," (3) by reimbursing only certain anti-union employees for vehicle damage their cars suffered on or near company premises, contrary to its normal practice; (4) by directing employees to report any pressure to sign union authorization cards; and (5) by declaring in its employee handbook its intention "to do everything possible" to remain union-free. The Board's remedial order requires ACE/CO to rescind the no-solicitation rule, to rescind the challenged handbook language, and to

make whole all employees who were not granted across-the-board wage increases in 1995 and thereafter. The Board now seeks enforcement of its order, and ACE/CO has asked that we set it aside.

II

Our review of the Board's findings of fact and application of the law is deferential, as both parties recognize. See, e.g., Beverly California Corp. v. NLRB, Nos. 98-3177, et al., 2000 WL 1286248, at *5 (7th Cir. Sept. 13, 2000). The Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. 29 U.S.C. sec. 160(e); Beverly, 2000 WL 1286248, at *5. Its conclusions of law are also entitled to deference if they have a reasonable basis in the law and are not inconsistent with the Act. NLRB v. Yeshiva University, 444 U.S. 672, 691 (1980); Beverly, 2000 WL 1286248, at *5; see also Central Transport, Inc. v. NLRB, 997 F.2d 1180, 1184 (7th Cir. 1993). Finally, we review the Board's choice of remedy only to ensure that it is narrowly tailored and that it effectuates the polices of the Act. See Beverly, 2000 WL 1286248, at *24; Ron Tirapelli Ford, Inc. v. NLRB, 987 F.2d 433, 437 (7th Cir. 1993). With these standards of review in mind, we consider first ACE/CO's challenges to the violations found by the Board, and then the remedy.

A.  Across-the-Board Wage Increase

The Board found that ACE/CO violated sections 8(a)(3) and 8(a)(1) by failing to grant an across-the-board wage increase in early 1995 and by communicating to the employees throughout that year that the Union was responsible for their failure to receive a raise. ACE/CO argues that the evidence did not show that it had a regular practice of giving an across-the-board raise, and that the real reason none was given in 1995 had nothing to do with the Union. Instead, it claims that it was in the process of revamping its entire compensation system in order to respond to the pressures of competition within the automobile and automotive parts industry, from one that used across-the-board measures to one that was entirely based on factors such as merit and training. The ALJ found that the facts supported the Board's allegations, and that whatever ACE/CO had begun to do with alternative compensation systems was still merely supplementary to, rather than in lieu of, its across-the-board raises.

Section 8(a)(3) of the Act prohibits an

employer from discriminating with regard to terms or conditions of employment in an attempt to encourage or discourage membership in any labor organization. 29 U.S.C. sec. 158(a)(3). Section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise" of their statutory rights, including especially their section 7 rights to organize. 29 U.S.C. sec. 158(a)(1). An employer violates both sections of the Act if it departs from an established practice of granting wage increases because of a union organizing campaign or other union activity. See, e.g., NLRB v. Shelby Memorial Hosp. Ass'n, 1 F.3d 550, 557–58 (7th Cir. 1993); NLRB v. Don's Olney Foods, Inc., 870 F.2d 1279, 1285 (7th Cir. 1989).

A critical factual question underlies this part of the Board's case: did ACE/CO have an established practice of granting annual across-the-board wage increases at the time the Union began its organizing campaign in late 1994? Both the ALJ and the Board found as a fact that it did, and so the question for us is whether that finding is supported by substantial evidence. Once we have resolved that point, the rest of this part of the case falls in place. ACE/CO's position is that it was between a rock and a hard place during the campaign: if it granted the wage increase, it would violate section 8(a)(1) by giving an impermissible benefit, see Mercury Indus., Inc., 242 NLRB 90 (1979); if it did not, it would find itself where it does today. The dilemma was real, however, only if there was no established practice. If there was, then the law is clear that the employer is safe if it makes no changes (either positive or adverse) during the course of a campaign. See Shelby Memorial, 1 F.3d at 558; Don's Olney Foods, 870 F.2d at 1285.

With respect to that factual issue, the ALJ decided to begin his consideration of ACE/CO's practice in 1989, the first year after the collective bargaining relationship with the earlier union had terminated. In February 1989, the company announced that its hourly employees would receive a 10-cent per hour wage increase effective February 13, 1989, and an additional five-cent per hour increase effective August 14, 1989. Individual incentive rates would be adjusted proportionately, and the merit pay system would remain unchanged. The next year, the company announced on February 5, 1990, that a 15-cent per hour across-the-board wage increase would take effect on February 12, 1990, and that the utility rate for all employees would increase by five cents per hour on August 13, 1990. In 1991, there was no general wage increase, but in 1992, on February 7, ACE/CO announced an increase effective February 17 in the utility rate of 20

cents per hour, and it added that shop employees would receive an additional five cents per hour effective August 17, 1992. On February 8, 1993, the company announced an increase in the utility rate of 20 cents per hour, effective February 15; shop hourly employees received an additional five cents per hour effective August 16, 1993. The pattern continued in 1994: on February 14, ACE/CO announced an increase in the utility rate of 20 cents per hour effective February 21, and an extra five cents per hour for the shop employees effective August 15, 1994. In each of those years, ACE/CO had followed a similar procedure for deciding whether to offer increased wages and how much to offer. It relied principally on three sources of information: the increase in the cost of living, if any, over the preceding 12 months; conversations with other foundries in the area to see if they were granting wage increases; and reports in general business publications. Its goal was to keep its wages at a competitive level.

It was against this backdrop that the ALJ evaluated what happened in 1995. As noted above, some time in the middle of 1994, the Union began its organizing drive at ACE/CO's facility. In mid-October 1994, company representatives met with new employees, in part to discuss the Union's organizing effort. At that time, they assured the group that each year the company:

reviews what is happening in the Milwaukee market place with wages and benefits. It looks at the year's performance for the Company, and then decides what type of wage and benefit adjustment can be made. An announcement is usually made in January of each year. That's what happens each year--when there is no union.

Aluminum Casting, 2000 WL 678727, at *12. During a meeting in November 1994, company officials again told the employees that annual wage and benefit reviews occurred each year in November and December, that the company was then in the process of conducting that review, that it would decide what changes to recommend, that the announcement of the change would be made in January, and that the change would take effect in February.

Yet another reiteration of this message occurred at a December 7 meeting of the employees. In response to employees' questions regarding when they would get their next pay adjustment, company representatives answered as follows:

In addition to merit increases [the company] surveys in January the wages of comparable companies in the Milwaukee area in order to

provide pay adjustments to remain competitive. This is particularly important in a tight job market as currently exists in the Milwaukee area.

Our past and present practice is to conduct the survey in the Fall, to announce the increase in late December of [sic] early January, and to put the increase into effect in February.

Obviously if a union comes in, wages would be subject to the process of bargaining and wage programs could not be changed up or down during that process. The law does not provide time guidelines as to how long negotiations could last. That could take months or years.

Id. A number of additional statements along these lines were also made.

In our view, these statements provided ample evidentiary support for the ALJ's finding, affirmed by the Board, that ACE/CO indeed had a regular practice of giving annual across-the-board wage increases when economic circumstances warranted; the evidence showed that ACE/CO usually concluded that circumstances did warrant an increase (before the contested 1995 decision, it reached this conclusion in every year except 1991). It is also notable that the company continuously reaffirmed its normal practice to the employees throughout the election campaign. It did not develop any reluctance to give an across-the-board increase until after it learned the results of the January 5-6, 1995, election. The Board was entitled to conclude that ACE/CO's current explanation for the decision not to give an early 1995 general wage adjustment--its desire to abandon across-the-board measures in favor of a purely merit and incentive-based system--was an afterthought, at least as applied to 1995.

Given the fact that ACE/CO had an established practice, its arguments that it was caught in a no-win situation cannot prevail. Indeed, it is when an employer during an organizing campaign departs from its usual practice of granting benefits that it creates trouble for itself. In that situation, the Board is entitled to infer an intent to influence the upcoming election and conclude that the employer's conduct violated the Act. See, e.g., Shelby Memorial, 1 F.3d at 557; Don's Olney Foods, 870 F.2d at 1285. As we said in Don's Olney Foods:

[i]n order not to unfairly influence a union election, the employer must maintain the pre-union status quo respecting employee benefits, viewed dynamically; that is, expectations of upcoming benefits created by the employer either by promises or through a regular pattern of

granting benefits cannot be disappointed without proof of a union-neutral justification.

870 F.2d at 1285. The Board here was not persuaded by ACE/CO's efforts to show that kind of union-neutral justification in its alleged transition to a different philosophy of compensation or its alleged effort to preserve an influence-free election environment.

Immediately after the election, ACE/CO issued a statement to the employees on January 9 announcing that its failure to grant the annual wage increase was not because of the election, but instead because the company wanted to preserve the laboratory conditions needed for a fair election. In February 1995, it similarly said that it was postponing any wage increase until the election was certified, again noting that it did not wish to interfere with employee free choice. (Obviously this would not have interfered with anyone's free choice in the already-completed January 1995 election; it had to be a forward-looking statement that anticipated success in setting that election aside and conducting a new one--a step that had not yet occurred.)

Other statements like this were made throughout the spring, but the one that had the greatest impact on the ALJ appeared in a leaflet distributed on June 27, 1995, after the January election had been set aside. The leaflet was entitled "One Year Later," and it contained the following passage:

Just about a year ago, the UE started its effort to get into our plant and your pockets. Remember the big promises of $1.00 an hour increases, new benefits and quick successes?

Since then, there have been no increases in wages except for those under plans started by [the company] before the Union. No changes in benefits have occurred.

The NLRB has just concluded four months of hearings concerning election objections. However, the legal proceedings may go on for many more months and possibly even years. We have had employees threatening other employees, employees filing charges and lawsuits against other employees. Instead of trying to bring us together, the UE has turned group against group, employee against employee.

In the one-year period before the UE stuck its nose in, you had a wage increase, a new pay for knowledge program, and benefit changes. Ask yourself--weren't we all a lot better off?

Aluminum Casting, 1999 WL 220279, at *14. Both the ALJ and the Board regarded the statements made during the spring and early summer of 1995, culminating in the June 27 leaflet, as evidence that ACE/CO was unlawfully attempting to blame the Union for the fact that there was no 1995 across-the-board wage increase. Furthermore, the ALJ noted, there were no across-the-board wage increases for any years following 1995, for the same reason. Id.

An employer may deviate from its normal practice of granting wage increases during an organizing campaign when it advises its employees that an expected raise is to be deferred pending the outcome of the election, to avoid the appearance of election interference. See Parma Indus., Inc., 292 NLRB 90, 91 (1988). But in those situations, the employer must also take care to convey the message that the adjustment will be awarded whether or not the employees select a union. Shelby Memorial, 1 F.3d at 558. Not only did ACE/CO fail to communicate that message (just like the employer in Shelby), but it went further and attempted to blame the union for the lack of the across-the-board benefit. Or, to put the same point more accurately, the ALJ and the Board were entitled so to construe the evidence before them, including the leaflet and the other statements made throughout the spring of 1995.

Finally, the ALJ and the Board concluded that at least as of 1995, the merit and incentive programs were still complementary to the across-the-board adjustments, and they were not perfect substitutes for the established system. They were impressed by the fact that in all of its explanations for its failure to adjust the wages, ACE/CO never once mentioned the development of an alternative system; instead, it just blamed the union. In fact, in meetings held in November 1994 and December 1994, it discussed both its expanded training and development programs and its intention to give the annual wage increase.

Based on this record, the Board was entitled to conclude that ACE/CO's decision in early 1995, just after the Union had won the initial election, not to give an annual across-the-board wage adjustment, violated sections 8(a)(3) and 8(a)(1) of the Act. We therefore enforce that part of the Board's order and move on to the company's other challenges.

B.   Prohibition of Solicitation

The Board found that ACE/CO violated section 8(a)(1) by maintaining in its Rules of Conduct a

rule that prohibits employees from "[s]oliciting or selling on company premises except when all concerned are relieved from duty." The Board regularly finds phrases like "relieved from duty" to be objectionable because they can be understood to prohibit employees from engaging in protected conduct from the time they enter on duty (i.e., punch in) until the time they leave for the day. Such a rule would prohibit protected activities even during breaks and lunches, and would be presumptively unlawful. See NLRB v. Trailways, Inc., 729 F.2d 1013, 1018, 1021 (5th Cir. 1984); NLRB v. Rooney, 677 F.2d 44, 45 (9th Cir. 1982). The Board's finding that the ACE/CO rule fell on the unlawful side of the line is consistent with its prior cases and is an interpretation of the law that we have no reason to disrupt.

ACE/CO points out that a presumptively invalid rule can be rescued by evidence that the rule was communicated or applied in such a way as to permit solicitation during break times and lunch. See, e.g., Essex Int'l, Inc., 211 NLRB 749, 750 (1974). That, it claims, is just what it did. In 1994, it posted another no solicitation rule in its cafeteria that only prohibited solicitation during working time and working hours, and defined working time in a way that clearly excluded breaks and lunch periods. But the rule posted in the cafeteria made no reference to the Rule of Conduct, nor did it tell the employees which rule took precedence. Cf. Beverly, 2000 WL 1286248, at *16; Publishers Printing Co., 317 NLRB 933, 934 (1995), enforced, 106 F.3d 401 (6th Cir. 1995); Essex, 211 NLRB at 750. Conscientious employees who had read both the Rule of Conduct and the posting in the cafeteria would not have known what was or was not permitted. Particularly in the absence of evidence like that in Essex, 211 NLRB at 750, showing that employees were explicitly told that they could solicit during lunch and break times, we conclude that the Board's decision was supported by the evidence and is entitled to enforcement.

C. Reimbursements for Vehicle Damage

During the organizing campaign, vehicles belonging to four employees were damaged while they were parked on or near company property. The victims, all union opponents, thought that the Union was responsible for the vandalism, and they complained to management. There was no evidence that this was so, nor was there any evidence that the damage to the cars had even occurred while the employees were at work. Nevertheless, ACE/CO reimbursed the employees for the damage in amounts ranging from $40 to $350. Noting that the

company (a) had restricted its reimbursements in the past to situations in which the company itself caused or might have caused the damage, (b) did not ask for any support for the allegations that the damage was caused by union supporters, and (c) was acting contrary to its past practice, the Board found that these reimbursements violated section 8(a)(1).

This finding is amply supported by the evidence. The ACE/CO Director of Labor Relations conceded that the company never announced any general offer to employees that they could obtain reimbursement for damage to cars parked on or near its property. Instead, the Director admitted that the company had offered these reimbursements in conversations in which the recipients were providing anti-union statements in connection with the election challenge.

D.  Union Authorization Cards

On March 13, 1995, ACE/CO distributed a memorandum in which it requested employees to inform their supervisors when they were approached by someone and asked to sign a union authorization card. Specifically, the memorandum said "If anyone puts you under pressure to sign a union card, tell your supervisor and we'll take every legal step to see that the union stops." This was, of course, after the contested election and during the time when the possibility of a new election was recognized by everyone. ACE/CO witnesses testified that the company had received reports that certain employees had been threatened and pressured, and that this was a protective measure.

Requests from an employer to report "threats" to employees are not unlawful, as the ALJ acknowledged. See Liberty House Nursing Homes, 245 NLRB 1194, 1197 (1979). But "threats" (which had been addressed by an earlier February 2 memorandum) and "pressure" are two different things, in spite of ACE/CO's efforts to conflate them here. A management witness testified that one employee complained that he felt pressured because the Union had visited his home 13 times, but the witness admitted that the employee never said that he felt threatened. The ALJ and the Board found that the March 13 statement violated section 8(a)(1), because it encouraged employees to report union activity that is protected by the Act. Such reporting, or the risk of it, has the effect of discouraging the employees from engaging in protected activity. C.O.W. Indus., Inc., 276 NLRB 960, 961 (1985).

ACE/CO's only response to this claim is to urge

that its intention in distributing the leaflet was to impress upon its employees the significance of the authorization card and to address possible coercion of its employees. But its intent or purpose is irrelevant under section 8(a)(1) of the Act. See Carry Companies of Illinois, Inc. v. NLRB, 30 F.3d 922, 934 (7th Cir. 1994). Because the Board's finding that the memorandum was used to learn the identity of union adherents in violation of the Act is supported by substantial evidence, it too is entitled to enforcement.

E.  Employee Handbook

Last, we consider the Board's conclusion that ACE/CO violated section 8(a)(1) by stating in its employee handbook its "intention to do everything possible to maintain our company's union-free status for the benefit of both our employees and [the company]." The handbook, including that statement, was originally distributed in 1991, more than three years before the union campaign. It was contained in a section entitled "What about a Union?" that described ACE/CO's prior bad history with a union and announced its opposition to unions. The handbook was re-issued in February 1995, shortly after the election. This section was unchanged.

The ALJ (and then the Board) found that this statement, taken in the context of other unfair labor practices, was itself unlawful because the employees might understand it as conveying the message that ACE/CO would use even illegal tactics to keep a union out. The Board relied on its decision in Gravure Packaging, Inc., 321 NLRB 1296 (1996), in which it had found a violation of section 8(a)(1) when the employer told the employees in the heat of an election campaign that he would "do everything in his power" to remain non-union. Id. at 1299. ACE/CO responds that the more apt analogy for its case is the Board's decision in Ross Stores, Inc., 329 NLRB No. 59, 1999 WL 820559 (Sept. 30, 1999). There, the employer's president said that "he would do everything in his power to keep the union out of the building." The Board found no objective basis to conclude that the president's statement implied an unwillingness to take unlawful actions. Id. at *4.

One thing seems clear--evaluations of statements like the one before us must be made in the full context of each case. While that normally counsels deference to the Board, it does not imply a rubber stamp. The objective evidence in this case gives no reason to believe that the employees would have perceived the ACE/CO

handbook statement as something indicating a willingness to use unlawful tactics to keep the union out. If this statement, drafted long before any organizing campaign was on the horizon, is unlawful because it does not expressly disclaim all illegal activity, then no handbook would pass muster unless it had such an express disclaimer. In our view, the statute does not take such a dim view of the law-abiding tendencies of employers, and we will not do so either. We decline to enforce this part of the Board's order.

III

Last, we consider ACE/CO's challenge to the Board's remedial order. Most of the order addresses remedies for the violations we have discussed; the section that relates to the handbook, part 2(a), we set aside because we have found that there was no underlying violation. This leaves section 2(c), which reads as follows:

[ACE/CO must] [t]ake the following affirmative action necessary to effectuate the policies of the Act:

(c) Make whole all employees who were not granted annual wage increases in 1995 to date in the manner set forth in the remedy section of [the judge's decision, as modified by the Board's decision] (emphasis added).

ACE/CO argues that the Board did not have before it the question of any wage increases for years following 1995, and thus this order is inherently overbroad. At most, it claims, the order should address only the contested 1995 annual increase.

As we noted in Beverly, the Board's choice of a remedy is entitled to special deference. 2000 WL 1286248, at *24. Section 10(c) of the Act gives the Board remedial authority "to take such affirmative action . . . as will effectuate the policies of [the Act]." 29 U.S.C. sec. 160(c). On the other hand, a proposed remedy must be tailored to fit the unfair labor practice it is intended to redress. See Ron Tirapelli Ford, 987 F.2d at 437; see also Beverly, 2000 WL 1286248, at *24. Whether or not the remedy for back wages lies within the Board's discretion depends on how the underlying violation should be understood and how certain limitations the Board placed on its own order should be interpreted.

First, we consider the scope of the violation. As we emphasized earlier, the key to the Board's finding of a violation was the factual determination that ACE/CO had a normal practice of granting some kind of annual, across-the-board, wage increase to its employees. In that

sense, its complaint was focusing on 1995 only as an accident of the time when the charges were brought--April, May, and June of 1995. Its case rested on the proposition that the company wanted its employees to blame the union for the fact that the established practice was abandoned during the union campaign. No one necessarily anticipated that the new election would still be somewhere off in the future almost six years later, as the year 2000 draws to a close, but that is just the way things worked out. The Board reasonably concluded that the background presumption under which this order should operate was that the former practice of annual increases would go forward into the future.

Importantly, the order expressly did not bind ACE/CO to a perpetual practice of granting this particular kind of wage adjustment. To the contrary, it provided that "[t]he exact amounts of the wage increases due employees shall be determined in compliance proceedings, and shall be computed to the extent appropriate . . . . At the compliance stage, [ACE/CO] shall be given the opportunity to establish that even if it had followed its normal practice concerning annual wage increases, no increase would have been given in a particular year."

At oral argument, we asked counsel for the Board whether the language of the proviso meant (1) that ACE/CO would have to live forever with a presumption that its compensation system included some measure of across-the-board adjustments, even if cost-of-living increases or other external factors led to no change in a particular year, or (2) that ACE/CO would have the opportunity during compliance proceedings to show that it had completely abandoned across-the-board adjustments as a tool of company policy, in favor of the targeted merit, incentive, training, and development raises it has touted in its briefs. We were assured in unequivocal terms that the Board's order means the second of these two options. Thus, if, for example, in compliance proceedings relating to the year 1996, ACE/CO introduced evidence that it had abjured across-the-board raises forever, and the General Counsel could not show that this was untrue or pretextual, not only would that suffice to excuse ACE/CO from making any adjustments for 1996, but it would also establish this new baseline for future years as well.

On that understanding, we find that the Board's order is entitled to enforcement. ACE/CO sees no reason why hostility to unions would be seen to have anything to do with its decisions not to implement across-the-board raises for 1996 and years following, but it is hard to see why it

would not. After all, the company's policy remains steadfastly anti-union (as we were also told at oral argument); the pendency of these unfair labor practice charges has given the company a six-year reprieve from the possibility of a union that arose when the Union won the flawed January 1995 election; and the company may still be taking the same position it did in the spring of 1995 (i.e., it is the union's fault that employees no longer get across-the-board wage adjustments). As long as ACE/CO has a fair opportunity to prove the proposition it has argued so strongly here--that general wage increases are passe and it has found a better way to maintain competitive wage levels and corporate quality--the present order does no more than require payment of the 1995 increase (which the record as it stands shows would have been given but for the anti-union actions) and any later ones supported by the company's normal practice at that later time. We therefore find it enforceable as so construed.

IV

For the reasons stated, we Enforce in part and Remand in part for the Board to conform its order to this opinion. Costs on appeal shall be borne by ACE/CO.