[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10291
_____

Agency No. 10-CA-112406

MERCEDES-BENZ U.S. INTERNATIONAL, INC.,

Petitioner-Cross Respondent,

versus

INTERNATIONAL UNION, UAW,

Intervenor,

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross Petitioner

_____

Petitions for Review of a Decision of the
National Labor Relations Board
_____

(October 3, 2016)

Before MARTIN, ANDERSON and BLACK, Circuit Judges.

BLACK, Circuit Judge:

Mercedes-Benz U.S. International, Inc. (MBUSI) petitions this Court to review the order of a three-member panel of the National Labor Relations Board (NLRB or the Board) modifying and adopting as modified the recommended order of the administrative law judge (ALJ).  The Board found that MBUSI violated the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* (the Act), in three ways: (1) maintaining an overly broad solicitation and distribution rule that employees would reasonably understand to prohibit solicitation in work areas by employees not on working time of other employees not on working time; (2) prohibiting an employee not on working time from distributing union literature in one of MBUSI's team centers, which are mixed-use areas; and (3) prohibiting employees not on working time from distributing union literature in the MBUSI atrium, which is a mixed-use area. *Mercedes-Benz U.S. Int'l, Inc.*, 361 N.L.R.B. No. 120 (Nov. 26, 2014).  On petition for review, MBUSI challenges each of these findings, and the General Counsel of the NLRB cross-petitions this Court to enforce the Board's order.  The Union, United Automobile, Aerospace, and Agricultural Implement Workers of America (UAW), intervenes in support of the order.  After review, we enforce in part and remand in part with instructions.

## I.  BACKGROUND

First enacted in 1935, "a primary purpose of the National Labor Relations Act was to redress the perceived imbalance of economic power between labor and

management." *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 316, 85 S. Ct. 955, 966 (1965). The Act "sought to accomplish that result by conferring certain affirmative rights on employees and by placing certain enumerated restrictions on the activities of employers." *Id.* Section 7 of the Act grants employees affirmative rights such as the right to self-organize, to bargain collectively, "and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." National Labor Relations (Wagner-Connery Labor Relations) Act § 7, 29 U.S.C. § 157. Section 8 of the Act defends the Section 7 rights by prohibiting an employer's "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in [Section 7]." *Id.* § 8, 29 U.S.C. § 158(a)(1).

The Act also created and empowered the modern NLRB. *See* 29 U.S.C. §§ 153–156. Within the NLRB, the Act created the office of the General Counsel, which has final authority regarding investigations into unfair labor practices and prosecution of complaints before the Board. *Id.* § 153(d). The Supreme Court has described the Board's role in interpreting and applying the Act as follows:

> The Wagner Act did not undertake the impossible task of specifying in precise and unmistakable language each incident which would constitute an unfair labor practice. On the contrary that Act left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms. Thus a rigid scheme of remedies is avoided and administrative flexibility within appropriate statutory limitations obtained to accomplish the dominant purpose of the legislation.

3

*Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798, 65 S. Ct. 982, 985 (1945) (quotation marks omitted).

Applying Section 8 to a common issue, the Board has long held that an employer may not prohibit union solicitation by employees who are not on working time[1] irrespective of whether they are in working or non-working areas of the employer's property. *Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615, 621 (1962). An employer also may not prohibit distribution of union literature by employees who are in non-working areas and not on working time. *Id.* An employer may prohibit distribution in working areas, however, because "the employer's interest in cleanliness, order, and discipline [in a working area] is undeniably greater than it is in nonworking areas." *Id.* at 620. This petition involves MBUSI's alleged interference with protected solicitation and distribution in violation of Section 8.

A.  *The MBUSI Solicitation and Distribution Rule*

In Vance, Alabama, MBUSI operates two plants at which it manufactures luxury automobiles. In May 2012, the UAW began a campaign to unionize MBUSI's employees in Vance. MBUSI has a policy of strict neutrality with respect to unionization but maintains rules regarding solicitation and distribution of non-work related material by employees on MBUSI property. In pertinent part and

---

[1] "Working time" refers to "periods when employees are performing actual job duties, periods which do not include the employees' own time such as lunch and break periods." *See Our Way, Inc.*, 268 N.L.R.B. 394, 395 (1983).

for the pertinent time period, MBUSI's solicitation and distribution rule read as follows:

> MBUSI prohibits solicitation and/or distribution of non-work related materials by Team Members during work time or in working areas.

The General Counsel contends that this rule is overly broad because an employee would reasonably interpret the rule to prohibit protected union solicitation. Specifically, while an employer may not prohibit union solicitation in a working area by an employee not on working time of an employee not on working time, the final "or" in MBUSI's written rule suggests that MBUSI bars all solicitation in working areas.

*B. MBUSI Team Centers*

The MBUSI plant at issue in this case has 19 team centers, 15 of which are immediately adjacent to the production line and all of which are adjacent to the logistics aisle, an indoor path used by forklifts and other motorized vehicles to transport parts in the assembly area. The few team centers that are not immediately adjacent to the production line are between 10 and 60 feet from the production line. Some team centers are completely or partially walled, while other team centers are separated from the production line by chains.

Team centers serve several functions in the MBUSI production process. They serve as offices for Group Leaders and Team Leaders and as observation posts for engineers and quality personnel. From the team centers, these personnel

5

supervise a wide variety of aspects of production along the line, including quality, performance, machinery and tools, parts and equipment, output, shift assignments, and safety.  Team centers also serve as second offices for human resources staff and upper management.  Finally, at the beginning of each shift, Group Leaders use team centers to conduct pre-production meetings, after which the incoming shift relieves the outgoing shift.  Employees often gather in their team center for an indeterminate period before the pre-production meeting and may use the team center during shift and meal breaks (although about half eat in MBUSI's on-site cafeteria).

MBUSI's policy is to treat team centers as work areas when the production line is running and as non-work areas when the production line is halted.  Typically, the production line runs 24 hours a day, 7 days a week, except for 30-minute meal breaks, 10-minute shift breaks, and a brief pause during a shift change.  Per MBUSI policy, only during production line pauses (i.e. shift and meal breaks) may MBUSI employees distribute non-work literature to other MBUSI employees in the team centers.

On June 20, 2013, employee David Gilbert went to his team center a few minutes before his shift began.  Gilbert's team center is completely walled and approximately 10 feet from the production line.  In the team center, Gilbert distributed copies of a pro-union flyer to other off-duty employees.  Gilbert's Team

6

Leader and a human resources representative each separately spoke with Gilbert and informed him that he was not permitted to distribute literature in the team center while the production line was moving. Gilbert was not disciplined, and the conversation was polite and non-threatening.

*C.  The MBUSI Atrium*

The MBUSI atrium is the first room that an employee enters after arriving for work, parking, and passing through a security turnstile. The atrium is approximately 60 feet wide by 100 feet long. In the atrium, MBUSI maintains a security kiosk, a merchandise store, a medical office, a vehicle leasing desk, and an Alabama Credit Union branch. MBUSI uses the atrium to provide company and employee information through bulletin boards and television monitors. Because it accommodates several hundred employees beginning and ending their shift each day, the atrium becomes extremely congested and busy during shift change.

In late August, 2013, Gilbert, Kirk Garner, and several other MBUSI employees were distributing UAW handbills in the atrium during a shift change. Two MBUSI human resources representatives approached Garner and informed him that MBUSI prohibits distribution of literature in the atrium. A few hours later, the human resources representatives met with Garner and told him that MBUSI management had decided to permit distribution of literature in the atrium. Garner, a member of the UAW leadership council, informed Gilbert and

7

understood from that conversation that employees were thereafter permitted to distribute literature in the atrium.

## II.  PROCEDURAL HISTORY

On September 3, 2013, Garner initiated the underlying action charging MBUSI with unfair labor practices.  On February 21, 2014, the General Counsel consolidated Garner's charge with two charges filed by the UAW in October 2013 and January 2014 respectively.  The ALJ conducted a three-day hearing in April 2014 and issued his decision in July 2014.  The ALJ found that MBUSI had violated the act as follows:

> (a)  Maintaining an overly broad solicitation and distribution rule which employees reasonably would understand to prohibit solicitation, in work areas, by employees not on working time of other employees not on working time.
>
> (b)  Prohibiting an employee not on working time from distributing union literature in one of [MBUSI's] team centers, which are mixed use areas within [MBUSI's] plant.
>
> (c)  Prohibiting employees not on working time from distributing union literature in the atrium, which is a mixed use area within [MBUSI's] plant.

Among other things, the ALJ recommended that the Board order MBUSI to rescind its written solicitation and distribution rule and to cease and desist from prohibiting distribution of literature in the team centers and atrium by employees not on working time of employees not on working time.

MBUSI filed with the Board 22 exceptions to the ALJ's order.  In its brief, MBUSI primarily argued that the ALJ had misapplied the law regarding MBUSI's written solicitation and distribution policy, the team centers are work areas when the production line is moving, certain employees were not supervisors, and the atrium incident could not be a violation in light of its *de minimis* impact.  On November 26, 2014, the Board affirmed the ALJ's decision and adopted the ALJ's proposed order with a slight modification to the remedy.[2]  In a footnote, the Board noted that one member of the Board found it "unnecessary to pass on the status of [MBUSI's] team centers that are adjacent to its production line."

On January 23, 2015, MBUSI filed with this Court a petition for review of the Board's order (the Order).  On February 9, 2015, the General Counsel filed a cross-petition for enforcement.

MBUSI contends the Board erred in finding that MBUSI's written solicitation and distribution policy was unlawful because MBUSI could and did rebut the presumption that its ambiguous rule interfered with or restrained protected activity.  Additionally, MBUSI insists the Order is overly broad in imposing a remedy as to all team centers after explicitly considering only the team center in which Gilbert was censured.  MBUSI states more broadly that the

---

[2] The Board ordered that MBUSI rescind its written solicitation and distribution rule and gave MBUSI a few options to replace or amend its employee handbook.  The Board also required MBUSI to file a sworn certification with the NLRB attesting to the steps it has taken to comply with the order.

Board's mixed-use findings as to both the team centers and the atrium represent an unexplained departure from precedent. MBUSI also contends the Board erred in failing to find special circumstances justifying the prohibition on distribution of literature in team centers when the production line is moving.

The General Counsel answers that the Board need not find that MBUSI's employees subjectively believed the policy prohibited protected activity. Rather, the test is objective, and an employer's mere maintenance of an overly broad rule constitutes a violation. As to the team centers, the General Counsel contends the Order was consistent with precedent holding "[w]here an employer permits both work and non-work activities of a non-incidental nature to occur in the same area, the Board properly deems it a mixed use area." Likewise, the General Counsel states that MBUSI failed to support its special circumstances argument and the ALJ's decision was not limited to the team center in which Gilbert was censured. Finally, the General Counsel contends MBUSI waived its right to challenge the ALJ's finding that the atrium is a mixed-use area by failing to raise it to the Board in MBUSI's exceptions to the ALJ's proposed order.

MBUSI replies that its failure to challenge the ALJ's holding was excused by "extraordinary circumstances." Specifically, while the ALJ found a violation notwithstanding the *de minimis* effect of MBUSI's interference, the Board changed

10

the rationale for MBUSI's violation and found a violation due to interference that was not *de minimis*.

## III.  STANDARD OF REVIEW

The Court reviews *de novo* the Board's legal conclusions and reviews for substantial evidence the Board's findings of fact.  *See NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112, 76 S. Ct. 679, 684 (1956).  "[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."  *SEC v. Chenery Corp.*, 318 U.S. 80, 95, 63 S. Ct. 454, 462 (1943).  In other words, we may not enforce an order of the NLRB on alternate grounds without remanding to the Board for further consideration.  *See First Nat. Maint. Corp. v. NLRB*, 452 U.S. 666, 672 n.6, 101 S. Ct. 2573, 2577 (1981).

"[I]n light of its experience," the Board may fashion general rules and presumptions regarding the lawfulness of employer restrictions "without the necessity of proving the underlying generic facts which persuaded it to reach that conclusion."  *Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 493, 98 S. Ct. 2463, 2470 (1978).  Where the Board departs from prior decisions, however, it must explain the reasons for the new approach.  *NLRB v. Sunnyland Packing Co.*, 557 F.2d 1157, 1160 (5th Cir. 1977) ("[A]n agency must either conform itself to its own prior decisions or else explain the reason for its departure."); *see also Sharron*

11

*Motor Lines, Inc. v. United States*, 633 F.2d 1115, 1117 (5th Cir. 1981) ("[L]aw does not permit an agency to grant one person the right to do that which it denies to another similarly situated.  There may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case." (quoting *Mary Carter Paint Co. v. FTC*, 333 F.2d 654, 660 (5th Cir. 1964) (Brown, J., concurring))).[3]  Therefore, while we defer to the Board's rational constructions of the Act, *Ga. Power Co. v. NLRB*, 427 F.3d 1354, 1358 (11th Cir. 2005), such deference does not extend to unexplained deviations from prior Board precedent, *Sunnyland Packing Co.*, 557 F.2d at 1160; *NLRB v. WGOK, Inc.*, 384 F.2d 500, 503 (5th Cir. 1967).

## IV.  DISCUSSION

We consider in turn MBUSI's written solicitation and distribution rule, the distribution of union literature in MBUSI's team centers, and the distribution of union literature in the MBUSI atrium.

*A.  MBUSI's Written Solicitation and Distribution Rule*

A rule explicitly restricting protected activity is *per se* unlawful.  *Martin Luther Mem'l Home, Inc.*, 343 N.L.R.B. 646, 646 (2004).  An ambiguous or overbroad rule that employees would reasonably understand to prohibit protected

---

[3] In *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

activity, on the other hand, is *presumptively* unlawful. *Our Way*, 268 N.L.R.B. at 395 n.6. If a rule is presumptively unlawful, the employer can rebut the presumption with evidence showing that the rule "was *communicated* or *applied* in such a way as to convey an intent clearly to permit" the protected activity. *Id.* (quoting *Essex Int'l, Inc.*, 211 N.L.R.B. 749, 750 (1974)) (emphasis in original); *accord United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 915 (D.C. Cir. 2004); *NLRB v. Aluminum Casting & Eng'g Co.*, 230 F.3d 286, 293 (7th Cir. 2000); *Motor Inn of Perrysburg, Inc. v. NLRB*, 647 F.2d 692, 695 (6th Cir. 1981); *Am. Safety Equip. Corp. v. NLRB*, 643 F.2d 693, 696 (10th Cir. 1981); *Birmingham Ornamental Iron Co. v. NLRB*, 615 F.2d 661, 667 (5th Cir. 1980).

When an employer attempts to rebut the presumption of unlawfulness with extrinsic evidence of either communication or application, the ALJ and the Board ask whether the evidence shows that the employer "convey[ed] an intent clearly to permit" the protected activity. *Essex Int'l*, 211 N.L.R.B. at 750. If so, the overbroad rule does not represent a violation of the Act.[4] Before considering the Order, we review Board and circuit court cases applying this fact-based analysis.

---

[4] Contrary to the General Counsel's suggestion, the *Essex* rule permits an employer to rebut the presumption of invalidity that attaches to *any* overbroad solicitation or distribution workplace rule. *See United Servs. Auto. Ass'n*, 387 F.3d at 914 (applying *Essex* rule where company banned solicitation and distribution "at any time in the work area and only during non-working hours in non-work areas"); *Aluminum Casting & Eng'g Co.*, 230 F.3d at 293 (applying *Essex* rule where company banned solicitation "on company premises except when all concerned are relieved from duty"); *Birmingham Ornamental Iron Co.*, 615 F.2d at 667 (applying *Essex* rule where company banned " any soliciting on company premises and time"); *Shaw, Inc.*, 350

*1. Cases applying the* Essex *rule*

    *a. Cases finding rebuttal*

In *Standard Motor Products*, in an effort to rebut the presumption of unlawfulness, an employer offered evidence of both clarifying communication and application.  265 N.L.R.B. 482, 483–84 (1982).  The plant manager testified without contradiction "that it was his practice in going over [the employer's] rules with new employees to tell them that breaks were their own time and they could do what they wanted during breaks and lunch periods."  *Id.* at 484.  The manager also testified "that the rule was not applied or enforced against any kind of union talk," and the ALJ found that "there was no evidence in the record . . . to establish that any employee was under the impression that he could not engage in union activity during the lunch periods or breaktime."  *Id*.  Even a witness called by the General Counsel "testified that 'everybody' understood that breaks were their own free time."  *Id*.  The ALJ found, therefore, that the employer had rebutted the presumption of invalidity "by properly orally clarifying to employees the extent of application of the rule."  *Id*.  The Board affirmed the ALJ's decision.  *Id.* at 482.

---

N.L.R.B. 354, 377 (2007) (applying *Essex* rule where company banned solicitation during working time and "distribution of literature on company property at any time"); *Laidlaw Transit, Inc.*, 315 N.L.R.B. 79, 82 (1994) (applying *Essex* rule where company banned solicitation and distribution "on company property, on company time"); *Ichikoh Mfg., Inc.*, 312 N.L.R.B. 1022, 1022 (1993) (applying *Essex* rule where company banned solicitation and distribution of literature "on company premises or during company business hours").

In *The Broadway*, the ALJ considered *Standard Motor Products* to stand for the proposition that an employer could rebut the presumption upon showing that it had clarified the rule "either through oral communication, or in such a manner as to convey an intent to permit [lawful] solicitation." *The Broadway*, 267 N.L.R.B. 385, 403 (1983). Although the employer maintained an overbroad solicitation rule, the ALJ found that "employees were permitted to engage in a wide range of organizing activities in the employee lounge and canteen during their break and lunch periods with full knowledge of [the employer] and without interference." *Id.* The ALJ believed that "the uniform practice of applying the rule governing solicitation and distribution of literature in a manner fully consonant with [employees' Section 7 rights] constitutes a fully efficacious clarification of the rule." *Id.* at 403–404. The ALJ reasoned that "[t]he objective interpretation accorded the scope and limitation of [the employer's] rule by employees directly affected by it are more likely to be influenced by empirical experiences under the literal application of the rule, than by oral assurances." *Id.* at 404. The ALJ therefore concluded that the employer had rebutted the presumption. *Id.* at 403. The Board affirmed the ALJ's decision. *Id.* at 385.

In *American Safety Equipment Corp.*, the Tenth Circuit considered the propriety of the Board's having set aside a union election due to the employer's overbroad solicitation and distribution rule. 643 F.2d at 695. The court held that

15

the Board "erroneously applied" the *Essex* rule. *Id.* at 696. Specifically, the court noted the uncontradicted affidavits of one manager and two employees. The manager averred that employees were informed of and were otherwise well aware that the rules applied only to working time. The manager and the two employees all agreed that employees openly distributed union material during nonworking time without repercussion. *Id.* The court noted that the employer's evidence of clarifying written or verbal communication was limited but set aside the Board's order because "the evidence [was] uncontroverted that the rules were applied by [the employer] to permit proper Union solicitation." *Id.* The employer had rebutted the presumption with uncontradicted evidence that it "applied the rules lawfully, and that the employees understood [the rules] to permit [protected activity]." *Id.* at 697.

In *Motor Inn of Perrysburg*, the Sixth Circuit considered a violation regarding overly broad solicitation and distribution rules. 647 F.2d at 695. The court noted the ALJ's finding that the rules were never enforced, the lack of evidence that employees were chilled in exercising their Section 7 rights, and that "the evidence shows that the employees exercised these rights freely, openly, and frequently." *Id.* The court concluded, therefore, that "mere enactment of the overly broad rules was not a violation of the Act."[5] *Id.*

---

[5] This quote would be questionable if taken out of context. *See Lafayette Park Hotel*, 326

16

### b. Cases finding no rebuttal

In *Chicago Magnesium Castings Co.*, the ALJ found that an employer's ambiguous rule was a violation "even though it appears from evidence in the record discussed herein, that [the rule] has not been consistently enforced." 240 N.L.R.B. 400, 404 (1979). The ALJ held that the rule "was not cured by [the employer's clarifying letter] since this letter was not posted, but was simply handed to [one employee] alone." *Id.* The employer's "publication of its disclaimer was inadequate for the purpose of absolving it from liability for a violation of the Act." *Id.* The Board affirmed the ALJ's decision. *Id.* at 400.

In *Ichikoh Manufacturing*, the Board disagreed with the ALJ's application of *The Broadway* and found that the employer had failed to rebut the presumption. *Ichikoh Mfg.*, 312 N.L.R.B. at 1022. The Board noted the ALJ's "brief analysis" in which the ALJ found dispositive the employer's evidence that some employees "have been permitted to solicit fellow employees and distribute campaign materials to employees during their lunch and rest breaks in non-working areas." *Id.* The Board paraphrased the ALJ's reasoning to be "that the maintenance of a presumptively invalid no-solicitation rule is not violative of the Act, absent evidence that the rule ha[s] been enforced in an unlawful way." *Id.* The Board

---

N.L.R.B. 824, 825 ("Where the rules are likely to have a chilling effect on Section 7 rights, the Board may conclude that their maintenance is an unfair labor practice, even absent evidence of enforcement."). In *Motor Inn of Perrysburg*, however, the ALJ made findings that suggested open and knowing non-enforcement. 647 F.2d at 695; *see also infra*, note 7.

rejected the ALJ's reasoning and conclusion because there was no evidence that the employer "clearly communicated" any clarification and because "[t]he fact that some employees ignored the rule and were not disciplined fails to meet [the employer's] burden of establishing that it conveyed to employees 'an intent clearly to permit solicitation during breaktime or other periods when employees are not actively at work.'" *Id.* (quoting *Our Way*, 268 N.L.R.B. at 395 n.6).[6]

In *Laidlaw Transit*, an employer argued that it "overcame the presumption of invalidity" attached to its overbroad solicitation and distribution policy "by communicating to its employees that the policy permitted [protected activity]." 315 N.L.R.B. at 82.  The ALJ wrote that "[c]larifications of ambiguous rules or narrowing interpretations of overly broad rules must be effectively communicated to an employer's work force before the Board will conclude that the impact of facially illegal rules has been eliminated." *Id.* at 83.  The ALJ found no evidence of the employer's clarification and instead credited an employee's testimony that "no one in management ever explained to [the employee] what the meaning of the rule was." *Id.*  Thus, although the employer argued that it had clarified the rule by communication, the employer failed to meet its evidentiary burden on rebuttal. *See id.*  The Board affirmed the ALJ's decision. *Id.* at 79.

---

[6] The Board also mentions in a footnote that *The Broadway* does not support the ALJ's broad proposition because "[i]n that case, no exceptions were filed concerning the [ALJ's] finding that [the employer] had rebutted the presumptive invalidity of the no-solicitation rule." *Ichikoh Mfg.*, 312 N.L.R.B. at 1022 n.5.

In *Shaw*, the ALJ rejected an attempt by several employers to rebut the presumption that their overly broad distribution rule was a violation of Section 8. 350 N.L.R.B. at 377.  The ALJ found the employers' sparse evidence to be insufficient and listed showings the employers failed to make, such as "fail[ing] to adduce any evidence that [the employers] told employees that distribution during nonworking time was permitted [and failing to] show that [they] knowingly tolerated distribution by employees during nonworking time."  *Id*.  The ALJ therefore held that the employers "failed to show that the rule means anything other than what it says, viz., all distribution on company property at any time is prohibited."  *Id*.  The Board affirmed the ALJ's decision as to this violation.  *See id.* at 358.

In *Aluminum Casting & Engineering Co.*, the Seventh Circuit considered whether an employer had rebutted the presumption of invalidity by posting a lawful rule in its cafeteria.  230 F.3d at 293.  Noting that "the rule posted in the cafeteria made no reference to the [presumptively invalid rule], nor did it tell employees which rule took precedence," the court reasoned that "[c]onscientious employees who had read both [rules] would not have known what was or was not permitted."  *Id*.  Therefore, the employer had failed to adequately rebut the presumption.  *Id.* at 294.

      *c.  Summary*

19

The cases applying *Essex* indicate that, to *clearly convey* an intent to permit protected activity, an employer's communication must be broadly disseminated and authoritative. *See Aluminum Casting & Eng'g*, 230 F.3d at 293; *Laidlaw Transit*, 315 N.L.R.B. at 83; *Standard Motor Prods.*, 265 N.L.R.B. at 48; *Chicago Magnesium Castings*, 240 N.L.R.B. at 404. To clearly convey an intent to permit protected activity with evidence of a clarifying application, the employers' evidence should demonstrate that the employer *openly and knowingly* permitted employees to engage in the protected activity notwithstanding the available overbroad interpretation of the work rule. *See Motor Inn of Perrysburg*, 647 F.2d at 695; *Am. Safety Equip.*, 643 F.2d at 696; *Shaw*, 350 N.L.R.B. at 377; *Ichikoh Mfg.*, 312 N.L.R.B. 1022; *The Broadway*, 267 N.L.R.B. at 403–404. Without open permission of protected activity, the employer's clarification may not have reached all employees. Without knowledge of the protected activity, an employer cannot be said to have conveyed its intent to permit the activity.

Having attempted to articulate the line between sufficient and insufficient evidence that an employer clearly conveyed an intent to permit protected activity, we consider how (and whether) the *Essex* rule was applied in this case.[7]

---

[7] The General Counsel attempts to cast doubt upon the *Essex* rule by discussing a series of cases holding that "mere maintenance" of an overbroad rule is a violation. *See Martin Luther Mem'l Home*, 343 N.L.R.B. at 646; *Lafayette Park Hotel*, 326 N.L.R.B. at 825. But neither case expressly overrules *Essex* or *Our Way*, and neither case considers rebuttal of the presumption. Rather, the "mere maintenance" cases support the proposition that the General Counsel need not present evidence of enforcement to establish a *prima facie* case. *See Beverly Health & Rehab.*

   2.  *The ALJ's application of the* Essex *rule*

In the instant case, the ALJ correctly identified the *Martin Luther Memorial Home* framework and found that MBUSI's rule prohibiting "solicitation and/or distribution of non-work related materials . . . during work time or in work areas" did not explicitly prohibit protected activity but could reasonably be read to prohibit solicitation in work areas notwithstanding the fact that the employees may not be on working time.  The presumption of unlawfulness therefore arose.  The ALJ next considered MBUSI's proffered rebuttal evidence and found that MBUSI "generally allowed employees to discuss the union in the workplace" and "truly sought to be neutral" towards the UAW.

The ALJ next considered whether these findings rebutted the presumption of unlawfulness.  First, the ALJ acknowledged that "an employer can cure an ambiguity in a work rule by communicating further with employees" and that "[MBUSI's] defense may extend beyond the argument that it did not enforce the rule in its handbook."  Although the ALJ agreed with MBUSI that its non-enforcement "would contribute to how employees reasonably would understand

---

*Servs., Inc.*, 332 N.L.R.B. 347, 349 (2000) (citing *Our Way* for the proposition that "mere maintenance" *raises the presumption*).  It also bears mentioning that the absence of evidence of enforcement differs significantly from affirmative evidence "that the employees exercised [their] rights freely, openly, and frequently," *Motor Inn of Perrysburg*, 647 F.2d at 695, or that the employer engaged in "the uniform practice of applying the rule . . . in a manner fully consonant with [employees' Section 7 rights]," *The Broadway*, 267 N.L.R.B. at 403–404.  Thus, we are unpersuaded that the *Essex* rule no longer applies.

[the rule's] meaning," the ALJ expressed skepticism that MBUSI's evidence showed that it had *clearly conveyed* to its employees an intent to permit solicitation in work areas by employees not on working time.  The ALJ believed that MBUSI's employees would continue to rely on the written rule "for a definitive answer" and concluded that MBUSI therefore violated the Act by maintaining an overbroad solicitation rule.

We see no reversible error in the ALJ's analysis.  MBUSI showed that it generally permitted protected solicitation, but that is not necessarily enough.  *See Ichikoh Mfg.*, 312 N.L.R.B. at 1022 ("The fact that some employees ignored the rule and were not disciplined fails to meet [the employer's] burden of establishing that it conveyed to employees an intent clearly to permit [protected solicitation].").  MBUSI bore the burden on rebuttal to prove that it applied the rule "in such a way as to convey an intent clearly to permit" protected solicitation.  *Essex Int'l*, 211 N.L.R.B. at 750.  The ALJ did not believe that MBUSI  clearly conveyed to employees its intent to permit protected solicitation, and the ALJ's finding is supported by substantial evidence.  We therefore enforce the Order and deny MBUSI's petition for review as to this issue.[8]

## B.  Distribution of Union Literature in MBUSI Team Centers

---

[8] The specific portions affected are as follows:  paragraphs 1(a), 2(a), and 2(b) and the first, fourth, and fifth "We Will Not" paragraphs in the Appendix to the Order.

While the Act requires an employer to permit distribution of literature by employees on non-working time in non-work areas, an employer may prohibit distribution at any time in work areas. *See Stoddard-Quirk Mfg.*, 138 N.L.R.B. at 621. If special circumstances necessitate a more restrictive rule to maintain production and discipline, however, an employer may lawfully impose such a rule. *Id.* at 617 n.4, 620.

When deciding whether an area is a work area as contemplated by *Stoddard-Quirk*, "the Board has looked at the quality and quantity of work, which occurs in the area at issue, and examines whether the work is more than de minimus [sic] and whether it involves production." *Brockton Hosp.*, 333 N.L.R.B. at 1375; *see also Patio Foods v. NLRB*, 415 F.2d 1001, 1003 (5th Cir. 1969) (holding that a loading area was a work area notwithstanding the fact that employees used it for ingress and egress because "[t]he loading of trucks is no less a vital part of the production process because it is performed outside the plant building"). More recently, the Board has deemed certain areas to be mixed-use areas, in which distribution must be permitted. *See, e.g.*, *Transcon Lines*, 235 N.L.R.B. 1163, 1165 (1978) *enforced in relevant part*, 599 F.2d 719 (5th Cir. 1979).

Mixed-use areas have been found in lunchrooms,[9] hallways,[10] parking lots,[11] and driver assembly and waiting areas.[12] At oral argument, the General Counsel

---

[9] *Kaynard ex rel. NLRB v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1052 n.6 (2d Cir. 1980);

suggested the Board has never established a test to determine whether an area is mixed use. Certainly though, the numerous Board and circuit court cases finding a mixed-use area or reviewing a mixed-use finding can inform us as to the appropriate analysis.

### 1. A review of cases involving mixed-use areas

The "mixed-use area" moniker developed out of two different situations: (1) a converted mixed-use area, which is a work area that periodically accommodates non-work (or a mix of both work and non-work) for a fixed duration;[13] and (2) a permanent mixed-use area, which is an area that is perpetually

---

*Superior Emerald Park Landfill, LLC*, 340 N.L.R.B. at 457; *Saisa Motor Freight*, 333 N.L.R.B. 929, 934 (2001); *Ford Motor Co.*, 315 N.L.R.B. 609, 612 (1994); *G.H. Bass & Co.*, 258 N.L.R.B. 140, 144 (1981); *Oak Apparel, Inc.*, 218 N.L.R.B. 701, 701–702 (1975); *Rockingham Sleepwear*, 188 N.L.R.B. at 701.

[10] *DHL Express, Inc.*, 357 N.L.R.B. 1742, 1744 (2011); *Found. Coal W., Inc.*, 352 N.L.R.B. 147, 150 (2008).

[11] *Metro-W. Ambulance Serv., Inc.*, 360 N.L.R.B. No. 124, 2014 WL 2448663 at *62 (May 30, 2014).

[12] *U.S. Postal Serv.*, 339 N.L.R.B. 1175, 1185 n.29 (2003); *United Parcel Serv.*, 327 N.L.R.B. 317, 317 (1998); *Arkansas-Best Freight Sys., Inc.*, 257 N.L.R.B. 420, 424 (1981); *Transcon Lines*, 235 N.L.R.B. at 1165; *see also Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 472 (5th Cir. 2001) ("[E]ntrance areas to plants, where timeclocks, vending machines, and bulletin boards are located, are often mixed use areas.").

[13] *Kaynard*, 625 F.2d at 1052 n.6 ("Where, as here, a production area is regularly used by employees as a lunch area with the 'full knowledge and approval' of the employer, the Board's position is that the area ceases, for the duration of the lunch period, to be a 'work area' where distribution can be prohibited."); *Rockingham Sleepwear*, 188 N.L.R.B. at 701 (holding that an employer's sewing room, a work area, ceased to be a work area during lunch because the employer permitted employees to take their lunch in the sewing room and provided no alternate facility); *see also United Parcel Serv.*, 327 N.L.R.B. at 317 (finding drivers' assembly room to

24

used for both work and non-work activities.[14]  An employer may never prohibit distribution of literature in a permanent mixed-use area but may prohibit distribution in a converted mixed-use area when the area is being used as a work-area.  At oral argument, the General Counsel urged the Court to consider this a permanent mixed-use area case.  MBUSI, however, contends that this is a conversion case and that its policy permitting distribution when the production line is stopped is therefore lawful.  Based upon our review of conversion cases and permanent mixed-use area cases below, we conclude that mixed-use analysis is highly fact-intensive and often requires consideration of both conversion and permanent mixed-use cases.

### a.  Conversion cases

The earliest conversion case, *Rockingham Sleepwear*, does not use the term "mixed-use area" at all.  *See generally* 188 N.L.R.B. 698.  Rather, the case identifies a specific period during which a work area "is not a 'work area' . . . but a lunchroom where distribution may not lawfully be prohibited."  *Id.* at 701.  *Rockingham Sleepwear* involved a garment manufacturer that threatened to fire an

---

be mixed-use area "during… the prestart period"); *Ford Motor Co.*, 315 N.L.R.B. at 612 (substantially similar to *Rockingham Sleepwear*); *G.H. Bass & Co.*, 258 N.L.R.B. at 144 (same); *Oak Apparel, Inc.*, 218 N.L.R.B. at 701–702 (same).

[14] *See Metro-W.*, 2014 WL 2448663 at *62; *DHL Express, Inc.*, 357 N.L.R.B. at 1744; *Found. Coal W., Inc.*, 352 N.L.R.B. 147, 150 (2008); *U.S. Postal Serv.*, 339 N.L.R.B. 1175, 1185 n.29 (2003); *Arkansas-Best Freight Sys.*, 257 N.L.R.B. at 424; *Transcon Lines*, 235 N.L.R.B. at 1165.

employee who had distributed literature in the manufacturer's sewing room. *Id.* at 699. The manufacturer had no cafeteria or other facility where employees could eat. *Id.* Instead, the manufacturer would halt all production and permit employees to eat in the sewing room. *Id.* The trial examiner, with the Board's affirmance, held that the sewing room was therefore not a work area during the lunch period. *Id.* at 701. By restricting distribution of union literature by employees on their lunch break in a converted lunchroom, the manufacturer had violated Section 8. *See id.*

A few years later, in *Oak Apparel*, the Board considered a similar situation. 218 N.L.R.B. at 701. The employer, an apparel manufacturer, had prohibited several employees who had placed union "leaflets on machines in [the employer's] production area during the employees' 45-minute lunch break." *Id.* As in *Rockingham Sleepwear*, the employer had no designated lunch area and permitted employees to eat lunch at their machines. *Id.* Unlike *Rockingham Sleepwear*, "some employees (paid on a piece rate basis) continued to work at their machines during the lunch period." *Id.* The ALJ declined to find a violation but failed to clearly state a reason. *See id.* at 709. Citing *Rockingham Sleepwear*, the Board reversed the ALJ and found a violation because "[i]t [wa]s sufficiently clear from the . . . record that the work area was being used principally as a lunchroom at the time that the distribution of union literature was attempted." *Id.* at 701–702.

26

Years later, in *Ford Motor Co.*, the Board affirmed an ALJ's application of *Oak Apparel* to a case involving an employer's automobile engine test facility. 315 N.L.R.B. at 609–610, 612. The facility had four wings, each of which contained several enclosed testing cells. *Id.* at 611. "Between every two cells was a 'control room' with an interior glass window to permit the employee-technicians seated at consoles adjacent to the window, to see into the cell and monitor the tests." *Id.* In the center of the control room was a table that employees frequently used for lunch. *Id.* There was a separate cafeteria in the facility, but it was not always open. *Id.* An employee was stopped by supervisors while distributing union material during his lunch break to other employees who were both on their lunch break and sitting at the center table. *Id.* The ALJ disagreed with the employer's contention that "the control rooms remained worksites regardless of their periodic use as luncheon areas." *Id.* at 612. The ALJ quoted the Board's finding in *Oak Apparel* that "the work area was being used principally as a lunchroom at the time" and therefore held that the employer had violated the Act. *Id.*

The Second Circuit considered the conversion issue in *Kaynard ex rel. NLRB v. Palby Lingerie, Inc.*, 625 F.2d at 1052 n.6. Citing *Oak Apparel* and *Rockingham Sleepwear*, the court described the rule as follows:

> Where, as here, a production area is regularly used by employees as a lunch area with the "full knowledge and approval" of the employer,

the Board's position is that the area ceases, for the duration of the lunch period, to be a "work area" where distribution can be prohibited.

*Id.* Finding the rule to be reasonable, the Second Circuit affirmed a Board order finding that the employer had violated the Act when it fired an employee for repeatedly distributing union material in the production area during lunch breaks. *Id.* at 1051, 1052 n.6.

The Sixth Circuit has also considered a conversion case, *United Parcel Service, Inc. v. NLRB*, in which the employer had disciplined an employee-driver for distributing a union newspaper in a check-in area, "where drivers congregate before [their work day starts]." 228 F.3d at 775. The ALJ held that this "prestart period" was "the only time during the day that drivers assemble together off the clock." *United Parcel Serv., Inc.*, 325 N.L.R.B. 1, 4 (1997). In the check-in area, drivers were "free to talk, read newspapers and magazines, or stand around until their assigned starting time." *Id.* Although the employer offered evidence of work activities that took place in the check-in area at other times, the ALJ found that "during the prestart period itself . . . the package drivers are not on the clock and they do not perform work." *Id.* at 5. Likewise, evidence that "a supervisor [would] occasionally give some instructions or supplies to a driver during the prestart period," was "the exception and not the rule." *Id.* The ALJ therefore held that the check-in areas were non-work or mixed-use areas during the prestart

28

period.  *Id.*  The Board agreed, stating "concerns for protecting the production process . . . do not rise to the same level when an employer compromises a work area by permitting nonwork use of it."  *United Parcel Serv., Inc.*, 327 N.L.R.B. 317, 317 (1998).

On petition for review, the Sixth Circuit affirmed and enforced the Board's order.  *United Parcel Serv., Inc.*, 228 F.3d at 782.  Citing *Rockingham Sleepwear*, *Oak Apparel*, and *Transcon Lines*, the court described a mixed-use area as follows: "while some people may use the area for work, most of the employees use it for non-work purposes—such as a lunch area or a break area."  228 F.3d at 776.  The court held that the ALJ's findings of fact supported the mixed-use characterization and distinguished several work-area cases as "deal[ing] with areas still retaining the characteristics of a work area but where non-working employees happened to be found, not areas transformed into lounge or break areas during certain times of the day."  *Id.* at 777.

### b.  *Permanent mixed-use area cases*

In *Transcon Lines*, the Board challenged an interstate freight handling, hauling, and storage company's conduct in censuring an employee who distributed material critical of the local union in the "drivers' room" of the company terminal. 235 N.L.R.B. at 1164.  The drivers' room was open 24 hours per day to accommodate the company's around-the-clock operation.  *Id.*  Upon two hours'

notice of a trip, a driver would go to the terminal, punch the timeclock in the drivers' room, pick up and complete necessary trip documents, and read any company notices and bulletins. *Id*. A driver might also wait in the drivers' room for his or her companion driver. After a trip, a driver would complete travel documents and other reports and may wait in the drivers' room for transportation home. *Id*. "While in the drivers' room, the employees may drink coffee or eat snacks from machines provided therein, and may converse freely with other drivers." *Id*. Some drivers would go to the drivers' room to speak with other drivers, but the room was not commonly used for loitering. *Id*.

The drivers' room had two bulletin boards. *Id*. One belonged to the union, and the other contained miscellaneous items such as solicitations and religious material. *Id*. Although drivers were not paid for their time in the drivers' room, their mileage pay accounted for the fact that drivers must complete certain paperwork for each trip. *Id*. at 1165. There was no other location at the company's terminal where drivers could congregate, meet, and exchange information. *Id*.

The Board adopted the ALJ's proposed order, which rejected for several reasons the company's assertion that it lawfully prohibited distribution in the drivers' room. *Id*. First, the company had no non-discriminatory solicitation and distribution rule. Rather, the company permitted union distribution and

30

miscellaneous non-protected distribution in the drivers' room. *Id.* Second, to the extent one could determine a rule, the company's rule was impermissibly vague. *Id.* Third, "the drivers' room is, at best, a mixed use area, where drivers may either work or relax." *Id.* Fourth, the drivers' room "is also the only area where drivers can regularly communicate with one another on subjects of mutual concern." *Id.* The Board therefore found that the company had impermissibly prohibited protected distribution in violation of the Act. On appeal, the Fifth Circuit affirmed the Board's finding regarding the drivers' room but remanded the case upon concluding that the remedy was overbroad relative to the ALJ's factual inquiry and findings. *Transcon Lines*, 599 F.2d at 721, 722.

In *Superior Emerald Park Landfill*, the Board affirmed the ALJ's finding that an employer unlawfully prohibited distribution of union literature in a company lunchroom. 340 N.L.R.B. at 449, 457. During a union representative campaign, an employee had placed union literature on a table in the lunchroom, which was also used for occasional meetings. *Id.* at 453, 457. The employer used the lunchroom tables for distribution of information to employees, and witnesses testified to occasional employee use for things such as Girl Scout cookie sign-up sheets and other noncompany activities. *Id.* at 453–54. Citing *United Parcel Service* and *Rockingham Sleepwear*, the ALJ stated "if an area is used for production during most of the day, but serves as a lunchroom during the lunch

31

period, distribution of literature may not be prohibited." *Id.* at 456. The ALJ then noted that the occasional meetings in the lunchroom were "relatively infrequent and there is no doubt that the primary purpose of the room was as a lunch facility." *Id.* at 457. Therefore, the employer unlawfully prohibited distribution of union literature in its lunchroom, a mixed-use area. *Id.*

In *Foundation Coal West*, a two-member panel of the Board[15] affirmed the ALJ's finding that a coal mining company violated the Act by calling a sheriff to remove off-duty employees who were distributing union literature in the company's hallway. 352 N.L.R.B. at 147–49. In the hallway, one could find "the timeclock, . . . a bench where employees congregate to socialize and eat their lunch opposite the coffeemaker and microwave, various bulletin boards, three vending machines, an ice machine, . . . desks[,] and cabinets for first aid supplies, forms, medicine, and ear plugs." *Id.* at 148 (footnotes omitted). At the beginning of each shift, the employees would meet in a room off the hallway for a short pre-shift meeting. *Id.* "Occasionally the dispatcher will tell an employee of an assignment change in the hallway if they cannot contact the employee in the [room off the hallway]." *Id.* at 148–49. Some employees, blasters and drillers, would speak with each other or their supervisors in the hallway during shift change. *Id.* at 149.

---

[15] The Supreme Court later determined in a different case that a two-member panel may not exercise the Board's delegated authority. *See New Process Steel, L.P. v. NLRB*, 560 U.S. 674, 130 S. Ct. 2635 (2010). The ALJ's analysis, in which two Board members concurred, is nevertheless informative. *See DHL Express, Inc. v. NLRB*, 813 F.3d 365, 377 n.2 (D.C. Cir. 2016).

The time within which these work discussions would take place in the hallway was minimal, "as little as 15 minutes out of a 12-hour workday." *Id.*

After briefly discussing *Transcon Lines* and *United Parcel Service*, the ALJ found significant the fact that the employer's "main function is the digging, removal, sorting, and distribution of coal." *Id.* at 150. According to the ALJ, "[i]t is the main production areas of an employer's facility where the hazards of littering and maintaining order are paramount over employee distribution of literature." *Id.* Although there was "no doubt that some work incidental to [the employer's] main function takes place in the [h]allway," the hallway was at best a mixed-use area, "where both socializing and nonproduction work, incidental to [the employer's] main function, the production of coal, take place." *Id.* Therefore, the employer had violated the Act. In its brief affirmance, the two-member panel stated "we agree that the hallway at issue was a mixed use area in which extensive nonwork activities, such as dining and socializing, occurred and that, consequently, under extant Board precedent, [the employer] was not free to ban distribution of union literature in the hallway." *Id.* at 147 n.1.

Recently, the D.C. Circuit considered the Board's standards for mixed-use areas. *See DHL Express, Inc. v. NLRB*, 813 F.3d 365 (D.C. Cir. 2016). In *DHL Express*, an international shipping company on several occasions interrupted an employee trying to distribute union literature in a hallway in the company's United

33

States hub facility. *DHL Express, Inc.*, 357 N.L.R.B. 1742, 1743 (2011). The employer argued that its hallway was a work area because (1) employees traverse the hallway on their way to and from work and during the infrequent times when they must assist with a task in the company's ramp area, (2) on a less than daily basis, quality control personnel carry misplaced or damaged packages through the hallway for two or three minutes each trip, and (3) on a less than daily basis, the employer brings new employees or other visitors in the hallway for five to ten minutes for a tour. *Id.* at 1744. The evidence indicated that the employer had on several occasions permitted non-work solicitation and distribution activity in the hallway such as gymnasium membership solicitation and distribution of t-shirts hats, and raffle tickets in conjunction with major sporting events. *Id.* at 1745. The ALJ found that "the hallway area is used for recreation as well as some work but [the employer] compromised the hallway area by permitting nonwork use of it." *Id.* Therefore, the employer had violated the Act.

The Board affirmed but disagreed on the basis for affirmance. *Id.* at 1742. Two members based their affirmance on the employer's interference with distribution in a mixed-use area, stating that "an employer's right to preclude distribution of literature in working areas does not extend to mixed-use areas." *Id.* at 1742 n.1. One member believed that "the hallway could reasonably be considered a working area even if all activity within that area did not involve

34

employees performing work." *Id.* That member would have affirmed on the ALJ's alternate finding that the employer discriminated against union activity in its enforcement of the no-distribution rule. *Id.*

The D.C. Circuit enforced the Board's order and discussed at length the employer's challenge to the ALJ's mixed-use finding. *See DHL Express*, 813 F.3d at 375–78. According to the court, "[t]he Board has for decades—with court approval—found areas in which minimal or solely incidental work is conducted are to be considered 'mixed-use' areas in which a prohibition on distribution during non-work time has to be justified by special circumstances." *Id.* at 375 (citing *United Parcel Serv.*, 327 N.L.R.B. 317; *Transcon Lines*, 235 N.L.R.B. at 1165; *Rockingham Sleepwear*, 188 N.L.R.B. at 701). The employer argued the ALJ improperly broadened the test for a mixed-use area when he stated that the hallway was not used "exclusively" for work, but the court disagreed, stating "a miniscule amount of nonwork will not now convert a work area into a 'mixed use' area." *Id.* at 376. Rather, a mixed-use area is one in which "very little work occurs." *Id.* The court agreed with the analysis in *Foundation Coal West* and considered it persuasive that only incidental, nonproduction work took place in the hallway. *Id.* at 377–78. Therefore, the court found substantial evidence supporting the ALJ's mixed-use-area finding and enforced the Board's order. *Id.* at 378, 380.

   *c. Summary of the mixed-use area cases*

The mixed-use area cases reflect the variance typical of a fact-intensive analysis.  The core considerations for both conversion and permanent mixed-use areas are (1) the volume of work and non-work activity; (2) whether the non-work activity is limited to specific time periods; and (3) the nature of work and non-work activity.  *Cf. DHL Express*, 813 F.3d at 376 ("[T]he ALJ carefully considered the type, duration, and frequency of work and nonwork occurring in the hallway prior to concluding that it should be considered a 'mixed-use' area."); *United Parcel Serv.*, 228 F.3d at 776; *Kaynard*, 625 F.2d at 1052 n.6.

### 2.  *The ALJ's findings and the Order*

The ALJ found that the team centers are mixed-use areas and that MBUSI therefore interfered with protected activity in violation of the Act when it reprimanded Gilbert for distributing union literature in his team center in the minutes before shift change.  In deciding the team centers are mixed-use areas, the ALJ noted that the team centers have refrigerators, microwave ovens, and picnic tables in the same general area as filing cabinets, desks, and computers.  The ALJ also gave weight to the fact that employees use the team centers for lunch, citing *Superior Emerald Park Landfill*, 340 N.L.R.B. at 456 ("[I]f an area is used for production during most of the day, but serves as a lunchroom during the lunch period, distribution of literature may not be prohibited.").  The ALJ considered MBUSI's argument regarding the proximity of team centers to the production line

36

and the logistics line as an argument not that team centers are work areas but that MBUSI is entitled to an exception due to special circumstances. The ALJ declined to rule on special circumstances as to the other 18 team centers but found that MBUSI failed to demonstrate special circumstances as to Gilbert's team center.

The Board affirmed. One member of the Board noted separately that he considered it unnecessary for the Board to determine the status of any team center other than the one in which the June 20, 2013 incident occurred. Among other remedies, the Board ordered MBUSI to cease and desist from prohibiting employees not on working time from distributing literature in mixed-use areas, which the Board defined to include all of MBUSI's team centers.

### 3. The Board's errors

We conclude the Board's affirmance was error for two reasons. First, the ALJ failed to recognize the distinction between converted and permanent mixed-use areas and failed to analyze the relative volume and nature of work and non-work activity in the team centers. Second, the ALJ imposed a remedy that exceeded the scope of his factual inquiry and findings. We therefore decline to enforce the Order as to this violation and remand to the Board with instructions as stated below.

#### a. The inadequately supported mixed-use area finding

37

Team centers are walled or chained areas within the production area of MBUSI's plant. MBUSI uses the team centers daily in its production process as offices for Group Leaders and Team Leaders, as observation posts for engineers and quality personnel, and as the marshalling place for pre-production meetings. At least 15 of the 19 team centers are immediately adjacent to the production line, and all of the team centers are adjacent to the logistics aisle, an indoor path used by forklifts and other motorized vehicles to transport parts in the assembly area. The work that takes place in the team centers could hardly be described as "non-production" or "incidental" to MBUSI's main function, manufacturing automobiles. On the other hand, the General Counsel properly notes that employees often gather in the team centers for an indeterminate period before the pre-production meeting and use the team center during shift and meal breaks. During this time, employees may take advantage of the refrigerators, microwave, and picnic tables that can be found in the team centers.

The ALJ reasoned that "[t]he fact that the team centers serve as meeting and eating places for off-the-clock employees taking lunch or break time and also as offices for [MBUSI] clearly weighs in favor of finding the centers to be mixed use areas." The ALJ therefore held that "the team centers, which employees use to eat lunch while on nonworking time, properly are classified as mixed use areas." In support of its conclusion, the ALJ quotes *Superior Emerald Park Landfill*, which

38

observed that "if an area is used for production during most of the day, but serves as a lunchroom during the lunch period, distribution of literature may not be prohibited."  340 N.L.R.B. at 456 (citing *United Parcel Serv.*, 327 N.L.R.B. 317). Although the ALJ relied exclusively upon non-work use during lunch and break periods, the Order does not limit the mixed-use finding to any specific period of time.  This was error.

Some language in *Superior Emerald Park Landfill* appears to suggest that if a production area is used for lunch, distribution must be perpetually allowed in the area.  *See* 340 N.L.R.B. at 456.  In fact, when a production area is converted to non-work use for a discrete period (such as lunch), the conversion cases hold that distribution may not be prohibited *during the non-work period*.  *See United Parcel Serv.*, 327 N.L.R.B. at 318 (affirming and adopting an order that required the employer to cease and desist enforcing its no distribution rule "*prior to the starting time of the package drivers*," 325 N.L.R.B. at 12 (emphasis added)); *Rockingham Sleepwear*, 188 N.L.R.B. at 701 ("[I]n effect, the sewing room, *for the duration of the lunch period*, is not a 'work area' . . . but a lunchroom where distribution may not be lawfully prohibited." (emphasis added)).[16]  This is the essence of the distinction between converted mixed-use areas and permanent mixed-use areas.

---

[16] We attribute *Superior Emerald Park Landfill*'s incomplete statement of the holding in conversion cases to the fact that *Superior Emerald Park Landfill* is not a conversion case at all. In *Superior Emerald Park Landfill*, the room was used for "occasional meetings," but "the

The ALJ's analysis, affirmed by the Board without comment, does not support the conclusion that the team centers are permanent mixed-use areas. The only non-work use to which the ALJ refers occurs during the lunch period and scheduled breaks. This evidences conversion, not perpetual mixed use.

The ALJ's analysis cannot support a permanent mixed-use finding for a second reason: the ALJ failed to "carefully consider[] the type, duration, and frequency of work and nonwork occurring in the [team centers] prior to concluding that [they] should be considered [] 'mixed-use' area[s]." *See DHL Express*, 813 F.3d at 376. The ALJ made no finding regarding the relative volume of work and non-work that takes place in the team centers or regarding the number of employees who use the team centers for each. *See id.* at 375–77; *United Parcel Serv.*, 228 F.3d at 776. Nor did the ALJ consider whether the work that takes place in the team centers is essential or merely incidental to production. *See DHL Express*, 813 F.3d at 375–77. As discussed above, the ALJ did not find that team centers are perpetually used for both work and non-work activities. Thus, the ALJ's analysis fails to support a conclusion that the team centers are permanent mixed-use areas.

---

primary purpose of the room was as a lunch facility." 340 N.L.R.B. at 457. That is a far cry from "an area [that] is used for production during most of the day." *Id.* at 456. Thus, *Superior Emerald Park Landfill* does not support broadening the remedy in converted mixed-use cases.

Although we find that the ALJ misapplied the mixed-use test to conclude that the team centers are permanent mixed-use areas, we note that the Order may be supportable in a narrowed form.  As discussed above, if an employer temporarily converts a work area to non-work or mixed-use, the employer may not prohibit distribution of literature among employees on non-working time.  *See United Parcel Serv.*, 325 N.L.R.B. at 4, 5.  The ALJ's mixed-use analysis was fixated upon the lunch period and scheduled breaks (periods during which MBUSI already permits distribution), but the ALJ's findings of fact include references to a third time period.  In the several minutes before a shift change, off-the-clock employees gather in the team centers in anticipation of their shift.  During that same period, supervisors in the team centers prepare for a pre-shift meeting.  It is during this period that the alleged violation underlying this issue took place.

We believe that Board precedent may have supported a conclusion that the team centers are converted mixed-use areas during the pre-shift period.  The ALJ did not analyze the effect of the pre-shift period on the work status of the team centers, however, and we may not adopt alternate grounds to enforce a Board order.  *See First Nat. Maint. Corp.*, 452 U.S. at 672 n.6, 101 S. Ct. at 2577 ("Because the court adopted different grounds for enforcement of the Board's order, it was error to enforce without a remand to the Board for further examination of the evidence and proper factfinding.").  We therefore decline to

41

enforce the Order[17] but remand for the Board to consider whether the evidence and its precedent support the narrower finding that MBUSI's team centers are converted mixed-use areas during the pre-shift period.

### b. The overbroad remedy

Even if we agreed with the Board's mixed-use finding, we would be compelled to deny enforcement of the Order as written because it imposes a remedy that exceeds the scope of its factual findings by a factor of 19. In compliance with *Stoddard-Quirk Manufacturing*, after concluding that all 19 team centers are mixed-use areas, the ALJ considered whether special circumstances justified MBUSI's prohibition on distribution of literature in team centers when the production line is moving.

Before the ALJ, MBUSI offered testimony regarding the pace of its just-in-time production process, the proximity of team centers to the production line and the logistics aisle, the dangers associated with vehicular traffic in the logistics aisle, and MBUSI's safety concerns regarding distribution of literature. The ALJ noted the persuasiveness of some of MBUSI's testimony, stating as follows:

> The team center depicted in [MBUSI's offered] video was so close to the production line and so proximate to the hustle and bustle of the assembly process it produced an intuitive feeling that this busy place certainly must be a work area, even if there is a picnic table for workers to use on breaks and at lunch. *At the least, it created the*

---

[17] The specific portions affected are as follows: the last four words of paragraph 1(b) and the words "team centers and" in the Appendix to the Order.

> *impression that unique circumstances warranted an exception to the general rule* that an employer could not prohibit distribution of union literature in a mixed use area.

(emphasis added). The ALJ noted the significant differences among the 19 team centers, however, and concluded that "it would not be appropriate to generalize from the video." The ALJ concluded that MBUSI failed to meet its burden of showing special circumstances as to the team center where Gilbert was distributing union literature, "which is the only team center relevant to the allegations." Therefore, the ALJ reasoned, "I need not, and do not, decide whether special circumstances existed at any other team center, such as the one depicted in the video."

Although only one team center was relevant to the inquiry and the ALJ explicitly declined to consider whether MBUSI met its burden of proving special circumstances at any of the other 18 team centers, the Order requires MBUSI to cease and desist from distributing literature in "its team centers." Nothing in the Order limits its scope to the sole team center that the ALJ considered. Rather, even though MBUSI's evidence "created the impression that unique circumstances warranted an exception to the general rule" at least as to one team center, the Order uniformly applies to all team centers. This was error.

As the former Fifth Circuit noted in *Transcon Lines*, when the Board "narrow[s] the case for decision purposes," it may not then "broaden it to the

widest possible limits for purposes of remedy." 599 F.2d at 722. Because the ALJ

and the Board declined to consider MBUSI's evidence of special circumstances as

to the 18 team centers not at issue, the Order cannot impose a remedy as to those

team centers. Therefore, on remand, absent additional factfinding regarding

special circumstances at the other team centers, the Board may consider a violation

and a remedy only as to the team center at which Gilbert attempted to distribute

union literature.

## C. Distribution of Union Literature in the MBUSI Atrium

Before the ALJ, MBUSI contended that any interference with Section 7

rights was *de minimis* because within hours of stopping Garner and Gilbert's

handbilling MBUSI retracted its position prohibiting distribution in the atrium.

Alternatively, MBUSI argued that its atrium is a work area where it can lawfully

prohibit distribution. The ALJ found that MBUSI's atrium was at most a mixed-

use area and that MBUSI therefore violated the Act by prohibiting Garner and

Gilbert from distributing union literature in the atrium during their non-work time.

The ALJ agreed that MBUSI's interference was *de minimis* but nevertheless

recommended the Board find a violation because "[MBUSI's] continued position

that the atrium is a work area leaves open the possibility that it might decide to

reverse its distribution policy sometime in the future."

MBUSI filed 22 exceptions to the ALJ's decision and recommended order, none of which identified the ALJ's finding the atrium to be a mixed-use area. In fact, MBUSI expressly disavowed its previous argument that the atrium was a work area, stating that it wished to "remov[e] that issue from consideration." Instead, MBUSI insisted that any interference with protected activity was *de minimis* and not a sufficient basis for a violation. The Board disagreed and affirmed the ALJ as to both the mixed-use finding and the violation.

Before this Court, MBUSI contends the Board erred in concluding that the MBUSI atrium is a mixed-use area.[18] We need not address this possible error, however, because MBUSI waived the issue by failing to raise it before the Board.

Section 10 of the Act precludes judicial review of an error not first raised before the Board absent extraordinary circumstances. 29 U.S.C. § 160(e). We find nothing extraordinary in the circumstances that led MBUSI to make the tactical decision to focus its argument before the Board on the *de minimis* issue. We also find nothing extraordinary in the fact that the Board would not have entertained a motion for reconsideration on the mixed-use issue for the same reason we do not consider the issue: waiver. With nothing to review, we summarily enforce the Order as to this violation.

---

[18] With Court approval, MBUSI withdrew from consideration its *de minimis* argument.

45

V.  CONCLUSION

For the foregoing reasons, we enforce the Order with the exception of the last four words of paragraph 1(b) and the words "team centers and" in the Appendix.  We remand to the Board with instructions to consider whether MBUSI's team centers are converted mixed-use areas during the pre-shift period. If so, the Board should either narrow the scope of the Order to Gilbert's team center or conduct additional factfinding regarding special circumstances at the 18 team centers the ALJ did not consider.

**Enforced in Part, Enforcement Denied in Part, and Remanded in Part with Instructions.**

MARTIN, Circuit Judge, dissenting in part:

I agree with the Majority's ruling about the atrium violation and Mercedes-Benz's solicitation and distribution policy. I also agree with the Majority that the ALJ's remedial order regarding the team centers was overbroad. The order should be remanded to the Board to either narrow its scope or do more factual development about special circumstances at the eighteen team centers for which the ALJ did not make findings.

However, I do not agree with the Majority's holding that "the ALJ failed to recognize the distinction between converted and permanent mixed-use areas and failed to analyze the relative volume and nature of work and non-work activity in the team centers." The Board does not impose this distinction on its factfinders, and I believe it exceeds our institutional role to create these categories and require the Board to apply them.

The ALJ and the Board followed the Board's precedent in designating the team centers as mixed-use areas after finding and reviewing the facts. I would affirm the Board's ruling that the team center where Mr. Gilbert distributed union materials is a mixed-use area. I respectfully dissent.

I.

We apply a narrow and deferential standard of review to Board decisions.

47

"[T]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall . . . be conclusive." 29 U.S.C. § 160(f).  "So long as the Board has made a plausible inference from the record evidence, we will not overturn its determinations, even if we would have made different findings upon a de novo review of the evidence."  Cooper/T. Smith, Inc. v. NLRB, 177 F.3d 1259, 1261 (11th Cir. 1999); see also NLRB v. McClain of Ga., Inc., 138 F.3d 1418, 1424–25 (11th Cir. 1998) ("Our standard of review is limited . . . to determining whether the Board's inference . . . is supported by substantial evidence—not whether it is possible to draw the opposite inference.").

We also defer to the Board's expertise in developing rules that create legal presumptions.  See Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798, 65 S. Ct. 982, 985 (1945) (The National Labor Relations Act "left to the Board the work of applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms.  Thus a 'rigid scheme of remedies' is avoided and administrative flexibility within appropriate statutory limitations obtained to accomplish the dominant purpose of the legislation."); Beth Israel Hosp. v. NLRB, 437 U.S. 483, 492, 98 S. Ct. 2463, 2469 (1978) ("The effect of [the Board's] rules is to make particular restrictions on employee solicitation and distribution presumptively lawful or unlawful . . . .").  For example the distribution of union materials in nonworking areas is

48

presumptively lawful.  See Stoddard-Quirk Mfg. Co., 138 N.L.R.B. 615, 621 (1962).  Congress gave the Board authority to use its national labor relations policy expertise to formulate rules that balance conflicting legitimate interests such as employee-organization rights and employer-property rights.  Beth Israel Hosp., 437 U.S. at 492, 500–01, 98 S. Ct at 2469, 2473.  Thus, "[t]he rule which the Board adopts is judicially reviewable for consistency with the Act, and for rationality, but if it satisfies those criteria, the Board's application of the rule, if supported by substantial evidence on the record as a whole, must be enforced."  Id. at 501, 98 S. Ct at 2473–74.  Instead of reviewing the Board's rules, the majority creates its own rule and faults the ALJ for not applying it.

## II.

The Majority's opinion presents the distinction between "permanent" and "converted" mixed-use areas as a framework established by the Board.  Indeed, the Majority cites "45 years of Board precedent" to support its distinction.  But I read none of the cases it cites to state a rule creating or even distinguishing between two types of mixed-use categories.  It is beyond our deferential role to create a rule and then hold that the ALJ erred in failing to apply it.  See NLRB v. Curtin Matheson Sci., Inc., 494 U.S. 775, 786, 110 S. Ct. 1542, 1549 (1990) ("[T]he NLRB has the primary responsibility for developing and applying national labor policy.").

49

The Majority recognizes that the Board has never clearly established a test for deciding whether an area is mixed-use. And it is the Board that has the expertise to establish a test if it decides one is necessary. The Board can also choose to grant its ALJs flexibility in crafting solutions for a circumstance that is unique. See Beth Israel Hosp., 437 U.S. at 500–01, 98 S. Ct at 2473 ("[I]t is to the Board that Congress entrusted the task of 'applying the Act's general prohibitory language in the light of the infinite combinations of events which might be charged as violative of its terms.'" (quoting Republic Aviation, 324 U.S. at 798, 65 S. Ct. at 985)). What matters here is that the Board has extended this flexibility to ALJs charged with making mixed-use determinations.

The Board's allowance of flexibility to ALJs in designating mixed-use areas results in some variations in that designation. For example, in Transcon Lines, 235 N.L.R.B. 1163 (1978), the ALJ found generally that "the drivers' room is, at best, a mixed use area, where drivers may either work or relax." Id. at 1165. But in In Re United Parcel Serv., 325 N.L.R.B. 1 (1997), the ALJ ruled "that the check-in areas are used as nonwork or, at most, mixed use areas between 7:30 a.m. and the drivers' start time of 8:30 a.m.," thus limiting the area's mixed-use status based on the time of day. Id. at 3.

The Majority chooses one understanding of the Board's approach to these cases and makes it a new rule for how ALJs must analyze the facts of all cases

about distributing union materials.  Under the Majority's rule, an ALJ will now be required "to analyze the relative volume and nature of work and non-work activity" in a given area.  If both work and nonwork activities "perpetually"[1] occur in an area, then the Majority allows the ALJ to find that it is a "permanent mixed-use area."  If the activities are not "perpetual," then the Majority directs the ALJ to consider whether an area is "converted" to mixed-use during specific times of the day.  The Majority's requirements impose a framework of analysis on ALJs the Board has never adopted.  Beyond that, the Majority's requirement that ALJs consider time-limitations in "converted" mixed-use cases narrows the Board's existing rule, which already limits distribution to nonworking time.  See DHL Express, Inc., 357 N.L.R.B. 1742, 1743 (2011) ("The Board has long held that rules prohibiting distribution of literature are presumed valid unless they extend to activities during nonworking time and in nonworking areas.")  The Majority, while no doubt well intentioned, is doing the Board's job for it.

The Majority also cites the D.C. Circuit for support.  That court said that "[t]he Board has for decades—with court approval—found areas in which minimal or solely incidental work is conducted are to be considered 'mixed-use' areas in which a prohibition on distribution during non-work time has to be justified by

---

[1] The Majority does not explain this "perpetually" standard.  Is it that an area can be used at all times for either work or nonwork activities or both?  Or is it that an area is used for both types of activities at all times?  What about 80% usage of a space for either? 50%? 33%?

51

special circumstances." DHL Express, Inc. v. NLRB, 813 F.3d 365, 375 (D.C. Cir. 2016) (citing United Parcel Serv., 327 N.L.R.B. 317 (1998); Transcon Lines, 235 N.L.R.B. at 1165; Rockingham Sleepwear, 188 N.L.R.B. 698, 701 (1971)); see also United Parcel Serv., Inc. v. NLRB, 228 F.3d 772, 776 (6th Cir. 2000) (citing Transcon Lines and Rockingham to support a similar proposition). But two out of three of the citations the D.C. Circuit gave for this proposition are cases the Majority gives as examples of "converted mixed-use" (Rockingham and United Parcel Serv.) and the third is offered by the majority as a "permanent mixed-use" case (Transcon Lines). See DHL Express, 813 F.3d at 375. This contrasting view of identical case law given by two Circuit courts is more evidence that the Majority created its own framework instead of deferring to the Board's flexible approach. I do not understand the Board to have limited the definition of "mixed-use" to either of the categories imposed by the Majority. Rather, the Board has left room for the ALJs to designate mixed-use areas, or not, based on the various situations that come before them. See, e.g., Ford Motor Co., 315 N.L.R.B. 609, 612 (1994) (discussing specific employee activities at times of specific distribution incidents to determine whether there was a distribution violation); Transcon Lines, 235 N.L.R.B. at 1164–65 (referring to several fixtures and functions of a drivers' room in determining that it was "at best, a mixed use area, where drivers may either work or relax"); Rockingham, 188 N.L.R.B. at 701 (discussing plant schedule and

use of spaces at various times before determining when distribution must be allowed).

### III.

I view the ALJ's decision that the team center was a mixed-use area to be supported by substantial evidence. In Stoddard-Quirk, the Board held that employees can distribute union literature in nonworking areas on the employer's premises. 138 N.L.R.B. at 621. In Transcon Lines, the Board extended that holding to mixed-use areas, meaning areas where employees "may either work or relax." 235 N.L.R.B. at 1165. And the Board has reasoned that "[t]he concerns for protecting the production process which were at issue in Stoddard Quirk do not rise to the same level when an employer compromises a work area by permitting nonwork use of it." United Parcel Serv., 327 N.L.R.B. at 317; accord DHL Express, 357 N.L.R.B. at 1744. Further, the Board has recognized that "[i]t is the main production areas of an employer's facility where the hazards of littering and maintaining order are paramount over employee distribution of literature." Found. Coal W., Inc., 352 N.L.R.B. 147, 150 (2008). However, aside from these broader observations, the Board also recognizes that special circumstances can call for more restrictive rules. See Stoddard-Quirk, 138 N.L.R.B. at 617 n.4, 620. These complex realities have led the Board to avoid establishing a more detailed test for

determining whether an area is mixed-use.  I fear the Majority opinion puts this Court at cross-purposes with the Board in this way.

This case requires only the simple application of our precedent in NLRB v. Transcon Lines, 599 F.2d 719 (5th Cir. 1979).[2]  In that case we described "the drivers' room as a place for lounging, recreation and waiting, as well as a place to receive dispatches and complete documents."  Id. at 721–22.  On that record, we upheld the Board's finding that the room was a mixed-use area as "supported by substantial evidence."  Id. at 721.

This ALJ found that the team centers at issue here were mixed-use areas based on their use "as meeting and eating places for off-the clock employees taking lunch or break time and also as offices for [Mercedes-Benz] supervisors."  This finding was supported by the design of the team centers, which "resemble[d] an office in some respects and a breakroom in others."  The ALJ also considered special circumstances, finding that the evidence provided by Mercedes-Benz was not specific to the team center where Mr. Gilbert distributed union materials.

Our job is to review this finding to see whether it is supported by substantial evidence in the record.  This record shows the team centers are used for certain work functions, like pre-shift employee meetings.  They contain a few desks and

---

[2] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Id. at 1209.

computers, and work-related items like attendance calendars and bulletin boards are fixed to the walls. But the team centers also have the trappings of a typical breakroom, like refrigerators and microwaves for employees to use during breaks and before shifts. The centers also contain several tables that employees use for eating, drinking, and relaxing during lunch and break periods. Like the drivers' room in Transcon Lines, the team centers are used for a combination of work and non-work functions. The ALJ's designation of the team center as a mixed-use area was supported by substantial evidence.

## IV.

Also, in my view, the Majority fails to properly credit the analysis in the ALJ's order. The Majority opines that the ALJ erred because "the Order does not limit the mixed-use finding to any specific period of time." To the contrary, the ALJ ordered Mercedes-Benz to "[c]ease and desist from . . . [p]rohibiting employees not on working time from distributing literature to other employees not on working time in a mixed use area." This effectively limits the mixed-use status of the team centers to lunch periods, scheduled breaks, and pre-shift changes. While I don't agree with the Majority's invention of "converted mixed-use areas," even accepting it, the ALJ's order complies.

I respectfully dissent.